KELLY-NEVILS v DETROIT RECEIVING HOSPITAL

Docket No. 156442. Submitted May 17, 1994, at Detroit. Decided
    November 7, 1994, at 9:35 A.M.

Joyce Kelly-Nevils, for herself and as personal representative of
    the estate of Christopher L. Kelly, brought an action in the
    Wayne Circuit Court against Detroit Receiving Hospital and
    University Health Center, alleging negligence with respect to
    the harvesting of several of the decedent's organs. An individ-
    ual who was not, but had posed as, the decedent's brother
    authorized the removal of the organs. The plaintiff amended
    her complaint to further allege unlawful mutilation of the
    decedent's body in violation of her common-law right to possess,
    control, and bury the body of the decedent. The court, J. Phillip
    Jourdan, J., granted summary disposition for the defendant,
    ruling that it was immune from civil and criminal liability on
    the basis of good-faith compliance with the Uniform Anatomi-
    cal Gift Act, MCL 333.10101 *et seq.*; MSA 14.15(10101) *et seq.*
    The plaintiff appealed.

The Court of Appeals *held:*

1. The question whether compliance with the Uniform Ana-
tomical Gift Act was in good faith is a legal rather than a
factual question and, as such, is to be determined by the trial
court rather than the jury.

2. The trial court properly determined that the defendant
had acted in good faith in relying on the impostor's representa-
tion that he was the decedent's brother and only living relative.
The UAGA authorizes an organ donor's adult sibling, among
others, to consent to the donation and imposes no duty on a
hospital to investigate whether a person who claims to be the
donor's sibling is in fact the donor's sibling.

3. The defendant adequately pleaded good-faith compliance
with the UAGA as an affirmative defense to the plaintiff's
action.

4. Contrary to the plaintiff's contention, the grant of sum-

REFERENCES

Am Jur 2d, Dead Bodies §§ 119, 120, 122.
See ALR Index under Dead Bodies.

mary disposition was not premature. Further discovery would not have uncovered factual support for the plaintiff's claims. Affirmed.

1. DEAD BODIES — UNIFORM ANATOMICAL GIFT ACT — GOOD-FAITH COMPLIANCE — IMMUNITY FROM LIABILITY — QUESTION OF LAW.

Whether a person or a hospital has complied in good faith with the provisions of the Uniform Anatomical Gift Act so as to be immune from civil and criminal liability in connection with an organ donation is a question of law to be decided by a court (MCL 333.10108[3]; MSA 14.15[10108][3]).

2. DEAD BODIES — UNIFORM ANATOMICAL GIFT ACT — CONSENT TO DONATIONS — RELATIVES.

The Uniform Anatomical Gift Act does not impose on a hospital an actionable duty to investigate whether a person claiming to be one of the relatives authorized by the act to consent to the donation of a patient's organs is in fact related to the patient (MCL 333.10102, 333.10108[3]; MSA 14.15[10102], 14.15[10108] [3]).

*Thurswell, Chayet & Weiner* (by *Tammy J. Reiss* and *Judith A. Susskind*), for the plaintiff.

*Grier & Copeland, P.C.* (by *Rhonda Y. Reid*), for the defendant.

Before: MICHAEL J. KELLY, P.J., and CORRIGAN and C. D. CORWIN,* JJ.

CORRIGAN, J. Plaintiff appeals as of right the grant of summary disposition to defendant hospital pursuant to MCR 2.116(C)(8) (failure to state a claim) and MCR 2.116(C)(10) (no issue of material fact). In this case of first impression, we hold that the question of good-faith compliance with the provisions of the Uniform Anatomical Gift Act (UAGA), MCL 333.10101 *et seq.*; MSA 14.15(10101) *et seq.*, is one of law for the court and that the circuit court correctly ruled that because defendant hospital had acted in good faith, it was entitled to immunity under the UAGA.

* Circuit judge, sitting on the Court of Appeals by assignment.

## I. UNDERLYING FACTS AND RELEVANT STATUTES

On July 5, 1990, at 9:45 P.M., defendant hospital admitted John Doe No. 158, an unidentified man suffering from a gunshot wound to the head inflicted in the Cass Corridor. Hospital officials were not given any additional information about the shooting of John Doe No. 158, one of hundreds of unidentified victims admitted to defendant hospital each year.

John Doe No. 158 was diagnosed as brain dead. In compliance with state law, he was placed on life support, with the intent to disconnect him at the legally prescribed time. Early the next morning, around 7:00 A.M., a clean-cut, young man appeared at the hospital, asking about the unidentified shooting victim. He identified John Doe No. 158 as plaintiff's decedent, Christopher Kelly, and identified himself as Christopher's brother and only living relative, Shawn Kelly. Shawn Kelly then furnished hospital personnel with Christopher Kelly's date of birth and told them that they had been living together in a homeless shelter. No one asked Shawn Kelly to furnish proof of his identity.[1]

Hospital staff first informed Shawn Kelly about Christopher Kelly's terminal condition and solicited an organ donation from him. Shawn then authorized the harvesting of Christopher's liver, kidneys, corneas, and bones by executing a donor consent form. Shawn remained at Christopher's bedside, crying and grieving, until Christopher was

---

[1] At oral argument on the summary disposition motion in the circuit court, plaintiff's counsel argued that Shawn Kelly fit the description of one of Christopher Kelly's assailants. The circuit court observed that defendant had no knowledge whatsoever about the assailants' identities and noted that counsel's argument was not supported by the record. The record supplied to us is inadequate to test the truth of counsel's assertion.

pronounced dead at 9:00 A.M. on July 6, 1990. The hospital thereafter surgically removed several of Christopher's organs, in reliance on the consent form signed by Shawn Kelly.

In truth, nineteen-year-old Christopher Kelly had no brother. He is survived by his mother, plaintiff Joyce Kelly-Nevils, with whom he allegedly lived at the time of his death.[2] Detroit police finally located plaintiff on July 9, 1990, and informed her about Christopher's death after Christopher's fingerprints were obtained at the county morgue.

When plaintiff learned that defendant had harvested Christopher's organs, she filed suit, alleging defendant's negligence. Defendant answered and supplied affirmative defenses. Plaintiff, with leave of the court, later amended her complaint to allege unlawful mutilation of Christopher's body, in violation of her common-law right to possess, control, and bury the body of her son. Defendant then moved for summary disposition pursuant to MCR 2.116(C)(8) and (C)(10). The circuit court subsequently held that defendant was immune by virtue of the good-faith exception established in the UAGA and granted summary disposition.

In 1969, Michigan adopted the UAGA, 1969 PA 189, effective March 20, 1970, to encourage and facilitate the increasing demand for human tissue and organ donation for research and for transplantation. The UAGA has been adopted in all fifty states. The UAGA was substantially reenacted in Michigan in 1978 PA 368, MCL 333.10101 *et seq.*; MSA 14.15(10101) *et seq.* MCL 333.10102; MSA 14.15(10102) authorizes certain individuals, apart from the donor, to donate all or part of a dece-

---

[2] Defense counsel disputed this claim and argued that Christopher, a parolee, had been excluded from plaintiff's home because Christopher had repeatedly stolen the family car.

dent's body. The act establishes priorities of the right to authorize donations on the basis of the individual's relationship to the decedent:

> (2) Any of the following persons, in order of priority stated, when persons in prior classes are not available at the time of death, and in the absence of actual notice of contrary indications by the decedent or actual notice of opposition by a member of the same or a prior class, may give all or any physical part of the decedent's body for any purpose specified in section 10103:
> (a) The spouse.
> (b) An adult son or daughter.
> (c) Either parent.
> (d) An adult brother or sister.
> (e) A guardian of the person of the decedent at the time of the death.
> (f) Any other person authorized or under obligation to dispose of the body. [MCL 333.10102; MSA 14.15(10102).]

The act plainly authorizes an adult brother to consent to organ donation, unless someone of a higher priority opposes donation. MCL 333.10108(3); MSA 14.15(10108)(3) also plainly excepts persons, including hospitals, who act in good faith from liability for damages:

> A person, including a hospital, who acts in good faith in accord with the terms of this part or with the anatomical gift laws of another state or a foreign country is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for the act.

In *Lyon v United States,* 843 F Supp 531 (D Minn, 1994), the federal district court described the purposes of the UAGA:

> The Uniform Anatomical Gift Act is clearly

designed to balance two competing policy interests. There is a need for donations of eyes and other organs for transplantation and research purposes. Time is usually of the essence in securing donated organs at the time of the donor's death. The Act allows hospitals and physicians to ascertain with a high degree of certainty when someone is willing to donate organs, and to arrange for the prompt removal and preservation of organs. The Act also recognizes the religious and moral sensibilities of those who do not wish to donate organs. The Act does not compel organ donations nor does it establish a presumption that organs will be donated. *The good faith exception to civil and criminal liability is designed for situations . . . where because of confusion, an organ is removed without genuine consent. [Id. at 536].*

On appeal, plaintiff presents four claims of error: (1) whether a hospital's compliance with the good-faith provision of the UAGA is a question of fact; (2) whether defendant failed to comply with the good-faith section of the UAGA; (3) whether defendant waived the good-faith defense by failing specifically to plead the defense in its first responsive pleading; and (4) whether summary disposition was premature because further discovery was necessary.

## II. GOOD FAITH - A QUESTION OF LAW FOR THE COURT

Plaintiff contends that whether defendant hospital acted in good faith is a question of fact for the jury. She specifically argues that defendant's failure to investigate Shawn Kelly's representation that he was Christopher's brother and only surviving relative presents a question of fact for the jury regarding defendant's good faith.

Although the general question of the parameters of the good-faith inquiry under the UAGA is one of

first impression in Michigan, courts in other jurisdictions have discussed the good-faith immunity provisions of the UAGA. Remarkably, in two cases somewhat resembling the present case, purported relatives authorized organ donations. *Nicoletta v Rochester Eye & Human Parts Bank, Inc,* 136 Misc 2d 1065; 519 NYS2d 928 (1987) (purported wife); *Hinze v Baptist Memorial Hosp,* 1990 WESTLAW 121138 (Tenn App) (purported grandson).

In *Nicoletta, supra,* the plaintiff father brought an action for damages because the hospital and eye bank wrongfully enucleated his deceased son's eyes. The decedent's live-in girl friend and the mother of his two children falsely had identified herself as the decedent's wife in the hospital emergency room.

The New York court first held that the question of good-faith compliance pursuant to the UAGA is one of law for the court, after acknowledging that whether certain behavior satisfies a good-faith standard is usually a factual issue. Following an extensive review of good-faith decisions, the court rejected the view that in the UAGA context good faith is a factual question:

> In those cases, most of which involved dealings of a corporate or commercial nature, there was no express or specific criteria of a statutory nature incorporating such a 'standard of conduct' against which an individual's conduct could be measured, without submitting evidence in the form of in-court testimony to a trier of fact.
>
> In the instant case, however, the Court believes that the Legislature has created an objective standard by which the good faith of a donee could be measured. The Uniform Anatomical Gift Act establishes a statutory scheme which outlines the means of effecting an anatomical gift, the classes of individuals entitled to effect such a gift, and the

circumstances under which such a gift must be deemed null and void. None of the previous good-faith cases have involved such a definitive standard by which to judge a defendant's conduct. [*Nicoletta, supra* at 1068-1069.]

Pennsylvania has also held that the issue of compliance with the good-faith requirement of the UAGA is for a court to decide. *Brown v Delaware Valley Transplant Program,* 420 Pa Super 84; 615 A2d 1379 (1992). The reasoning in the *Nicoletta* and *Brown* cases is persuasive. Unlike good-faith questions in cases where the standards of conduct are not well-defined, and thus open to the conflicting opinions of reasonable persons, the UAGA provides objective standards against which a court may judge conduct. Following the lead of the New York and Pennsylvania courts, we also hold that the question of good faith under the UAGA is properly a matter of law for the court.

### III. NO GENUINE ISSUE OF MATERIAL FACT

We further conclude that the circuit court properly determined that defendant had acted in good faith in relying on Shawn Kelly's representation that he was Christopher Kelly's brother and only living relative. In *Nicoletta, supra,* the decedent's purported wife signed "Judy Shufelt" on the emergency room authorization form, and later signed a different name, "Judy Nicoletta (wife)," on the donor consent form. *Id.* at 1066. The nurse in charge questioned her about the discrepancy between the two names and received a plausible reply, i.e., that she sometimes signed her name one way, and sometimes signed it the other. An emergency room secretary also testified that she did not question the name discrepancy, given the increasing frequency with which married women

retain their maiden names. *Id.* at 1070. The court concluded that the hospital had conducted a reasonable inquiry concerning the purported wife's identity. In finding that the hospital had acted in good faith under the UAGA, the court observed:

> To require further action on the part of the defendant would not only impose an unreasonable duty upon the Hospital, but would also run afoul of public policy considerations, as such a decision would tend to jeopardize the whole process of organ donation by causing unnecessary delays, thereby frustrating the entire intent of the Uniform Anatomical Gift Act. [*Id.* at 1071; see *Lyon, supra* at 536.]

Similarly, *Brown, supra* at 1382, held that the UAGA "does *not* require any particular type of search for members of higher classes in order to establish the unavailability of members of that class."

We specifically reject the imposition of the duty that plaintiff suggests. A hospital need not conduct an independent investigation to ascertain that the signatory is legally authorized to consent. The act itself imposes no duty to investigate, and plaintiff has cited no authority for the existence of such a duty.

Plaintiff argues that defendant should have inquired further into decedent's family history and attempted to investigate Shawn's identity. Plaintiff offers no guidance about which individuals defendant should have investigated for further details. Because Shawn Kelly was an impostor, any further inquiry of him to develop a family history obviously would have been futile. In John Doe cases like this one, defendant routinely inquires of police whether any bystanders could identify the

victim. A hospital has no additional duty to investigate a plausible assertion of identity.

No person in a higher class under the statute ever actually notified defendant of opposition to the donation of Christopher Kelly's organs. Given the pressing emergency circumstances involved in cases of organ donation, we hold that a hospital has no duty to launch an investigation into a signatory's background. To do so would certainly frustrate the legislative purpose because "time is of the essence in securing donated organs at the time of the donor's death." *Lyon, supra.* The UAGA does not require hospitals to investigate the identity of a signatory claiming to be a member of one of the enumerated classes. As a matter of law, defendant complied in good faith with the requirements of the UAGA. We find no error warranting reversal.

### IV. GOOD FAITH UNDER THE UAGA AS AN AFFIRMATIVE DEFENSE

Plaintiff's initial complaint alleged that defendant acted negligently in failing to protect the body of Christopher Kelly, in failing to ask Shawn Kelly for identification, and in failing to notify the decedent's next of kin. Plaintiff's amended complaint alleged unlawful and intentional mutilation of a dead body and interference with plaintiff's right to possess, control, and bury her son. In response to plaintiff's first amended complaint, defendant sought summary disposition on grounds that the hospital had complied with the UAGA's good-faith provisions. Defendant acknowledges that plaintiff stated a cause of action under Michigan common law, but asserted that UAGA § 10108(3) exempts it from liability.

We hold that defendant sufficiently pleaded good

faith as an affirmative defense in its first responsive pleading, although it did not employ those specific words. Good-faith compliance with the UAGA constitutes an affirmative defense because it does not rebut plaintiff's prima facie case. In addition to those affirmative defenses specifically listed in MCR 2.111(F)(3)(a), an affirmative defense includes any defense that seeks to foreclose a plaintiff from continuing a civil action for reasons unrelated to the plaintiff's prima facie case. *Grand Blanc Landfill, Inc v Swanson Environmental, Inc,* 200 Mich App 642, 646; 505 NW2d 46 (1993). A party waives an affirmative defense unless the defense is set forth in its first responsive pleading. MCR 2.111(F)(3); *Campbell v St John Hosp,* 434 Mich 608, 615; 455 NW2d 695 (1990); *Grand Blanc Landfill, supra* at 645.

In its answer, defendant specifically averred that the hospital and its staff had observed their legal duties and acted in a "careful, prudent, proper, and lawful" manner with regard to their care of plaintiff's decedent, but did not specifically employ the words "good faith." Defendant satisfied its burden to assert an affirmative defense of good faith under the UAGA. The ordinary usage of "careful" means "cautious in thought, speech, or action;" "prudent" means "exercising good judgment or common sense;" and "proper" means "meeting a requisite standard of competence or validity." *The American Heritage Dictionary* (1973). In comparison, good faith is the "honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage." Black's Law Dictionary (5th ed). One who exercises good judgment or common sense and meets a standard of competence in the discharge of duties acts in good faith. Defendant adequately pleaded good faith as an affirmative defense.

## V. FURTHER DISCOVERY

Plaintiff finally contends that summary disposition was premature because further discovery could have uncovered evidence to defeat defendant's good faith. We disagree. Although summary disposition is usually inappropriate before the completion of discovery on a disputed issue, *Dep't of Social Services v Aetna Casualty & Surety Co,* 177 Mich App 440, 446; 443 NW2d 420 (1989), it may be appropriate if further discovery does not stand a fair chance of uncovering factual support for the opposing party's position, *Neumann v State Farm Mutual Automobile Ins Co,* 180 Mich App 479, 485; 447 NW2d 786 (1989); *Ransburg v Wayne Co,* 170 Mich App 358, 360; 427 NW2d 906 (1988); *Huff v Ford Motor Co,* 127 Mich App 287, 296; 338 NW2d 387 (1983). Plaintiff does not argue that further discovery would have uncovered evidence supporting her position. She merely reiterates the argument that the hospital should have made further efforts to validate Shawn's identity and to locate other relatives. We already have rejected the existence of such a legal duty. The grant of summary disposition was not premature.

Affirmed.