**Mary Ann PERRY, Ron Perry, Don Perry, Linda Huntsman, Beverly Blassingame, and Vickie Puff, Plaintiffs,**

v.

**SAINT FRANCIS HOSPITAL AND MEDICAL CENTER, INC. and American National Red Cross, Defendants.**

No. 93–4231–SAC.

United States District Court, D. Kansas.

April 26, 1995.

Nancy E. Freund, Murphy & Freund, Ronald P. Pope, Eugene B. Ralston & Assoc., P.A., Topeka, KS, for plaintiffs Mary Ann Perry, Ron Perry, Don Perry, Linda Huntsman, Beverly Blassingame, Vickie Puff.

Thomas L. Theis, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for defendant and cross-defendant St. Francis Hosp., Saint Francis Hosp. and Medical Center, Inc.

James S. Pigg, Kristine A. Larscheid, Fisher, Patterson, Sayler & Smith, Topeka, KS, for defendant and cross-defendant American Nat'l Red Cross.

## MEMORANDUM AND ORDER

CROW, District Judge.

"Death is unique. It is unlike aught else in its certainty and its incidents. A corpse in some respects is the strangest thing on earth. A man who but yesterday breathed, and thought, and walked among us has passed away. Something has gone. The body is left still and cold, and is all that is visible to mortal eye of the man we knew. Around it cling love and memory. Beyond it may reach hope. It must be laid away. And the law—that rule of action which touches all human things—must touch also this thing of death."

*Louisville & N.R. Co. v. Wilson,* 123 Ga. 62, 63, 51 S.E. 24 (1905).

This is a tissue donation case in which the plaintiffs allege the defendants took from the deceased Kenneth Perry's body more tissue than what the plaintiffs had agreed to donate. Specifically, the plaintiffs allege they gave their consent to remove the corneas from Kenneth's eyes and to remove the bone marrow from Kenneth's bones. The defendants, however, removed not just the corneas, but the entire eyes, and not just the bone marrow, but the large major bones from the upper arm, hip and leg regions.

The case comes before the court on the defendant Saint Francis Hospital's ("St. Francis") motion for summary judgment. (Dk. 121). The hospital requests oral argument on its motion. After reviewing the briefs and exhibits submitted, the court does not believe that oral argument would materially assist it in deciding the motion for summary judgment. The court denies the request for oral argument.[1]

The plaintiffs recently dismissed with prejudice their claims against the defendant American National Red Cross. (Dk. 146). In their response to the hospital's motion, the plaintiffs limit their claims against the hospital to the tort of outrage, breach of contract, and negligence. The court's prior order (Dk. 105), published at 865 F.Supp. 724, 729 (D.Kan.1994), also limited these pending claims in two material respects.

First, for the adult children of Kenneth Perry to have a breach of contract claim,

[1]. One other procedural matter needs discussing. The court's scheduling order (Dk. 29) sets the page limitation for reply memoranda at 20 pages. As the order spells out, a party may not exceed a page limitation unless the court grants leave upon the party's showing of a compelling reason. Without seeking or obtaining leave of the court, St. Francis filed a reply brief that violates the 20- page limitation. Though the violation is cause alone for striking the reply brief, the court believes the more appropriate sanction here is this admonition. The court believes its page limitations are generous and fair and expects every party to abide by them. The court will not tolerate any further violations.

they must allege and prove their consideration was something other than a right to donate Kenneth's body. Because Mary Ann Perry, as the surviving spouse of Kenneth, had the exclusive statutory and common-law right to custody of Kenneth's body, only she could contract with regards to that right. By a rhetorical question, the court recognized the possibility of the adult children's consideration being something other than their mother's right to donate: "Could not the adult children contract with the defendants for a particular harvest procedure in exchange for their promise to abide by, support, and counsel their mother in her decision to donate their father's body?" 865 F.Supp. at 728. Since such a contract would be consistent with the plaintiffs' allegations for breach of contract, the court denied the defendants' motions to dismiss this claim. *Id.*

Second, the court understood the plaintiffs' negligence claim to allege that the defendants owed a duty to conform their procedures and actions to what Nurse McDonald had represented as the manner for removing the corneas and bone marrow. 865 F.Supp. at 728. On this claim, the plaintiffs seek to recover for their emotional distress. The court followed the long-established rule in Kansas that a plaintiff may not recover for emotional distress unless either " 'the distress is accompanied by or results in a physical injury,' " or the wrongful act is " 'wanton or willful or . . . is committed with malice and intended to cause mental distress.' " 865 F.Supp. at 729 (quoting first *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 274, 662 P.2d 1214 (1983), and quoting second *Bowman v. Doherty,* 235 Kan. 870, 879, 686 P.2d 112 (1984)). Since the plaintiffs had alleged that the defendants' conduct was "gross and wanton," the court denied the defendant's motion to dismiss. 865 F.Supp. at 729.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case." *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). " 'The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the non-moving party. *Id.*

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine

witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS

For purposes of this motion only, the court considers the following facts to be uncontroverted.

1. On January 28, 1992, Kenneth Perry suffered a heart attack at his home and was transported by ambulance to the defendant St. Francis Hospital ("St. Francis"). Efforts to resuscitate Kenneth failed, and he was pronounced dead shortly after arriving at St. Francis.

2. Kenneth's widow is the plaintiff Mary Ann Perry. The remaining plaintiffs are Kenneth's adult sons and daughters. All of the plaintiffs, except Vickie Puff, were present at St. Francis at the time of Kenneth's death. Though residing in Mississippi, Vickie Puff was in contact by telephone with the other plaintiffs near the time of Kenneth's death.

3. A physician came to the room where the plaintiffs were waiting and told them of Kenneth's death. Before the physician left them, he told the plaintiffs they could stay there while they composed themselves.

4. Nancy McDonald, a night shift staff nurse in the emergency room at St. Francis, visited the plaintiffs in the waiting room and discussed before all the plaintiffs the matter of tissue donations. Nurse McDonald explained that Kenneth's death prevented an organ donation but that a donation of his body for research or a tissue donation of bone, skins and corneas remained as possible options. Saying they were opposed to disfiguring Kenneth's body because that is not what Kenneth would have wanted, the plaintiffs initially responded, "No" to Nurse McDonald's question about donations. Nurse McDonald then explained the procedure for donating the corneas in which they were just "peeled off" without removing the eyes from the dead body.

5. Nurse McDonald then left the waiting room while the plaintiffs discussed whether Kenneth would have wanted to donate his corneas. The plaintiffs decided the donation would have been acceptable to Kenneth as the procedure simply involved "peeling them off."

6. When Nurse McDonald returned, the plaintiffs told her of their decision to donate Kenneth's corneas. Nurse McDonald then asked again about a skin or bone donation and explained that only sections of bones could be taken. The plaintiffs again said they were opposed to such a donation. One of Kenneth's sons adamantly said that his father's body was not going to be taken apart. Nurse McDonald then began discussing a bone marrow donation and explained a procedure involving a needle and syringe without any disfigurement. Nurse McDonald again left the waiting room while the family discussed a bone marrow donation.

7. Nurse McDonald returned a short time later with a consent form for tissue donation. The plaintiffs informed her of their consent to donate only the corneas and the bone marrow. Nurse McDonald handed the consent form to Mary Ann Perry. The form had been completed with lines drawn through the "yes" column opposite all the separately listed body parts for donation. Mary Ann Perry modified the consent form by separately checking the "no" boxes opposite each named body part except for the boxes opposite "eyes" and "bone" in which she wrote "yes" in the "yes" boxes. Mary Ann Perry asked Nurse McDonald why the form just said "bone" when all that was being donated was bone marrow. Nurse McDonald assured Mary that those doing the surgical procedure would understand that bone marrow and not the bones were to be removed. Mary Ann Perry, Ron Perry and Beverly Blassingame then executed the consent form.

8. Nurse McDonald's recollection of these events and conversations differs significantly from the plaintiffs. She recalls asking the family first whether Kenneth had ever signed his driver's license indicating organ donation or discussed donation with Mary Ann Perry. The family said this had not been discussed.

Nurse McDonald remembers explaining the procedure for cutting the skin, removing the larger bones, and replacing the bones with rods or forms. She also recalls telling them that the entire eye is removed and replaced with a form. She said that these procedures kept the donations from causing a change that could be noticeable during an open casket funeral.

9. In her deposition, Nurse McDonald testified that the plaintiffs were the first family she could recall approaching about organ or tissue donations. Nevertheless, she testified that she felt comfortable at the time describing these surgical procedures and answering the family's questions in light of her recent in-service training concerning organ and tissue donations. Nurse McDonald testified she did not tell them that a cornea could be peeled off without removing the eye or that bone marrow could be donated without removing the bones. Nurse McDonald further testified that based on her prior in-service training she knew at the time that the surgical procedure for these donations entailed removing the entire eye and the bones. Based on her recollection of the conversations with the plaintiffs, Nurse McDonald opines that the information she provided the plaintiffs was true and correct to the best of her knowledge at the time.

10. Mary Ann Perry testified in her deposition that she did not know if Nurse McDonald intentionally misled her about the donations. When asked if Nurse McDonald appeared caring and supportive in their conversations about the donations, Mary Ann Perry answered: "I feel like once she got us to say okay to one thing, she pushed on to another. I mean, now, I feel like she was taking advantage of our situation and pushing the issue.... She wasn't yelling. She wasn't rude." (Mary Ann Perry Depo. at 128). When asked similar questions during her deposition, the plaintiff Beverly Blassingame said that Nurse McDonald appeared sympathetic to the family's feelings and emotions and displayed empathy and a demeanor consistent with what Beverly would expect

from a person discussing the donation process.

11. A retrieval team employed by the American Red Cross actually harvested the bone tissue from Kenneth's body. They cut the skin and removed "[t]he upper section of the arm, femur whole right and left, tibia whole right and left, fibula whole right and left, and iliac crest right and left." (Elysa Fabian Depo. at 56). They replaced the bones with wooden dowels and gauze cloth and sutured the skin.

12. Mary Ann Perry first learned that bones were removed from Kenneth's body when a representative with the funeral home told her to bring heavy clothing for the body to cover the bones that had been removed. She did not learn that the eyes had been removed until after this lawsuit.

13. The American Red Cross provided in-service training at St. Francis regarding the organ and tissue donation process including the surgical procedures used in retrieving particular organs and tissues.

14. During the relevant time period, St. Francis had a team of organ and tissue donor coordinators who were on call to handle donation inquiries and answer questions. Nurses are told during orientation to call the organ and tissue donor coordinator if they have questions.

The surviving spouse, Mary Ann Perry, and the surviving adult children, Ron Perry, Don Perry, Linda Huntsman, Beverly Blassingame and Vickie Puff, seek to recover against St. Francis on the following three legal claims: Count I–Intentional Infliction of Emotional Distress; Count II–Breach of Contract; and Count III–Negligence.

## GOOD FAITH IMMUNITY

 Only five years after it was first promulgated in 1968, all states, including Kansas in 1969, had adopted the main provisions of the Uniform Anatomical Gift Act ("UAGA"). *Unif. Anatomical Gift Act,* 8A U.L.A. 15, 15–16 (1983); *see* K.S.A. 65–3209 *et seq.*[2] The preface to the 1968 UAGA identifies the important purposes behind it:

---

**2.** The court previously summarized the different relevant provisions in Kansas' version of the 1968 UAGA. *Perry v. St. Francis Hospital &*

*Medical Center, Inc.,* 865 F.Supp. 724, 727 n. 3 (D.Kan.1994).

Wherever adopted ... [the 1968 UAGA] will encourage the making of anatomical gifts, thus facilitating therapy involving such procedures. When generally adopted, ... uncertainty as to the applicable law will be eliminated and all parties will be protected. At the same time the Act will serve the needs of the several conflicting interests in a manner consistent with prevailing customs and desires in this country respecting dignified disposition of dead bodies.

8A U.L.A. 15. Thus, UAGA was in response to the need for more family donations of organs and to the medical profession's uncertainty about whose consent was needed for those donations. Chad D. Naylor, *The Role of the Family in Cadaveric Organ Procurement,* 65 Ind.L.J. 167, 173 (1989). In addition, UAGA serves to maintain respect for the social, cultural, and legal rights of those involved in and affected by the organ procurement process.

The particular provision of this comprehensive statutory scheme at issue now is K.S.A. 65–3215(c) which creates a good faith immunity for those involved in the donation process:

> (c) A person who acts in good faith in accord with the terms of this act or the anatomical gift laws of another state or a foreign country is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act.

Plainly, this section extends protection to doctors and hospitals in all instances but where the challenged actions violate or exceed the terms of UAGA and are taken without a good faith effort to comply with UAGA.

St. Francis argues that the plaintiffs are unable to prove a lack of "good faith" and that the evidence, when viewed in the light most favorable to the plaintiffs, "shows at most a breakdown in communications between plaintiffs, the hospital personnel and the Red Cross retrieval team." (Dk. 122 at 13). St. Francis denies that there is any evidence of intentional wrongdoing, dishonesty or ill will on its part. According to St. Francis, "the worst that can be said of Nurse McDonald is that she failed to convey the limited nature of the donation." (Dk. 122 at 14). Finally, St. Francis maintains its immunity from liability would be consonant with UAGA's public policy goals.[3]

The plaintiffs insist there is sufficient evidence on which to find that in several ways Nurse McDonald acted in reckless disregard of UAGA's requirements and the plaintiff's directions. First, Nurse McDonald violated K.S.A. 65–3210(c) when she did not accept the plaintiffs' initial negative response and continued to request tissue donations. Second, Nurse McDonald misrepresented the limited surgical procedures for donating corneas and bone marrow. Third, Nurse McDonald misrepresented her intention to inform the retrieval team of the plaintiffs' limited donations. The plaintiffs deny that their claims would result in unreasonable duties on physicians and hospitals in tissue donation settings or would frustrate UAGA's altruistic and laudable aims.

The court is aware of at least seven decisions discussing the good faith immunity provision under UAGA, but none is by a Kansas court. *See Lyon v. United States,* 843 F.Supp. 531 (D.Minn.1994); *Kelly–Nevils v. Detroit Receiving Hospital,* 207 Mich.App. 410, 526 N.W.2d 15 (Mich.Ct.App.1994); *Nicoletta v. Rochester Eye and Human Parts Bank, Inc.,* 136 Misc.2d 1065, 519 N.Y.S.2d 928 (N.Y.Sup.Ct.1987); *Brown v. Delaware Valley Transplant Program,* 420 Pa.Super. 84, 615 A.2d 1379 (Pa.Super.Ct.1992), *appeal*

---

**3.** St. Francis specifically argues:

In almost every case of organ and tissue donation, you have multiple family members present when a discussion takes place with typically one hospital personnel. In almost every case, you can have a situation where family members can disclaim the contents of the written consent form and claim something else was said to them. Absent a provision which protects them from liability for anything other than "bad faith," hospital personnel would likely avoid involvement in the donation process in almost all cases. That of course would be contrary to the UAGA's express requirement that next-of-kin be approached about tissue donation at or near the time of death. Thus, the immunity provision fosters adherence to the specific requirements of the Act. This court should apply the UAGA's immunity provision in this case in furtherance of the UAGA's laudable objectives.

(Dk. 122 at 17).

*dismissed,* 535 Pa. 652, 634 A.2d 216 (Pa. 1993); *Callsen v. Cheltenham York Nursing Home,* 154 Pa.Commw. 541, 624 A.2d 663 (Pa.Commw.Ct.1993), *appeal dismissed,* —— Pa. ——, 652 A.2d 824 (Pa.1995); *Hinze v. Baptist Memorial Hospital,* No. 9, 1990 WL 121138, 1990 Tenn.App. LEXIS 601 (Tenn. Ct.App. Aug. 23, 1990); *Williams v. Hofmann,* 66 Wis.2d 145, 223 N.W.2d 844 (Wis. 1974). Four of these decisions define "good faith" the same, that is, an " ' "honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage." ' " *Lyon,* 843 F.Supp. at 533 (quoting *Nicoletta,* 519 N.Y.S.2d at 930 (quoting in turn Blacks's Law Dictionary 623 (5th ed. 1979))); *see also Kelly–Nevils,* 207 Mich. App. at 420, 526 N.W.2d 15; *Hinze,* 1990 WL 121138, at *4, 1990 Tenn.App. LEXIS 601 at *11. To assure uniformity in the enforcement and interpretation of UAGA among the different states adopting it, the court will apply the same general definition of "good faith." *See* K.S.A. 65–3216.

With one notable exception, these cases bear little factual resemblance to the instant dispute. For the most part, the cases decide issues of "good faith" efforts to locate, determine the identity, and obtain the consent of a family member. *See, e.g., Kelly–Nevils,* 207 Mich.App. at 412–13, 526 N.W.2d 15 (in good faith relied on consent from purported brother); *Nicoletta,* 136 Misc.2d at 1067, 519 N.Y.S.2d 928 (in good faith relied on consent from purported wife); *Brown,* 615 A.2d at 1382–83 (in good faith relied on state police's efforts to locate next of kin and on judicial proceeding authorizing hospital's decision); *Hinze,* 1990 WL 121138, at *1, 1990 Tenn. App. LEXIS 601 at *2–*3 (in good faith relied on consent from purported grandson).

The exception is *Lyon* where the decedent's eyes were removed even though his next of kin had refused their consent to any tissue donation. A new resident physician at the Veteran's Affairs hospital, who was unfamiliar with the hospital's forms and procedures, asked the family members to sign the "eye donor" authorization explaining it as merely a step in giving consent for an autopsy. 843 F.Supp. at 532. Other hospital staff later saw the authorization form and arranged for the eye donation. The dispute over the donation arose before the burial, and the eyes were returned and reset prior to interring. *Id.* The VA hospital conceded that no genuine consent for the donation was given but argued that its actions were taken always in good faith. In granting summary judgment for the VA hospital on it's good faith immunity, the court analyzed the facts in relevant part:

> The hospital claims that everyone who relied upon the form signed by Hanna and Susan Lyon believed it to be valid. The issue of the VA's good faith turns on whether that claim is true or whether the hospital arranged for the enucleation despite the fact that someone in authority knew that Jack Lyon and his family did not consent to the eye donation.
>
> . . . .
>
> There is no dispute that Dr. Meyer was confused about the form he was asking Hanna and Susan Lyon to sign to authorize the autopsy. And there is no dispute that they signed the form intending to authorize only an autopsy and not an eye donation. There is no question of Dr. Meyer's good faith. He thought he was complying with a bureaucratic formality. He had no intimation of the traumatic events he thereby initiated.
>
> . . . .
>
> Although the facts show that confusion was created by acts of VA personnel, the court finds that the hospital acted in good faith. When a question was raised concerning the validity of the consent form, the VA attempted to clarify it as best it could. After it became clear that plaintiffs had not consented to the donation of Jack Lyon's eyes, the hospital took steps to rectify the situation. The VA is thus entitled to immunity under the statute.

843 F.Supp. at 534, 535, 536. Like the plaintiffs in *Lyon,* the Perrys allege the misunderstanding over the limited donation was caused by hospital staff. Unlike the plaintiffs in *Lyon,* however, the Perrys assert the hospital staff were not just negligent but intentionally or recklessly misled them about the procedures for donating body tissue.

According to the plaintiffs' testimony, they repeatedly expressed to Nurse McDonald their opposition to removing Kenneth's eyes and bones. This evidence creates a genuine issue of material fact whether St. Francis had "actual notice of contrary indications" from the plaintiffs to a donation of the entire eyes and whole bones. *See* K.S.A. 65–3210(c). If it did have actual notice, then St. Francis was required by UAGA to not accept the eyes and bones. K.S.A. 65–3210(c). Viewing the case of *Lyon* as one example, a court could still find as a matter of law that a hospital's actions were taken in good faith even when a person in authority had actual notice of contrary indications. The instant case is not another example of such a situation.

Nurse McDonald has testified that when she discussed with plaintiffs the surgical procedures for removing the corneas and bone marrow, she knew the actual procedures did not entail leaving the eyes and peeling off only the corneas or leaving the bones and aspirating only the bone marrow.[4] For purposes of the summary judgment proceeding, the court must accept the plaintiffs' version of what Nurse McDonald described as the procedures. Consequently, a genuine issue of fact arises whether Nurse McDonald lacked an honest belief in what she told the plaintiffs and misled them into signing the consent while knowing their opposition to the removal of Kenneth's eyes and bones.

Mary Ann Perry testified that Nurse McDonald assured her that checking "bone" and "eyes" on the form was enough and that the retrieval team would still learn of the limited donations. Based on her in-service training, it is a fair inference that Nurse McDonald understood the organ donation process and the importance of a consent form. When considered together, this evidence creates another genuine issue of material fact whether Nurse McDonald appreciated that the retrieval team would take the entire eyes and whole bones based on the completed consent form if she did not inform the team about the Perrys' contrary wishes. In short, the evidence of record simply does not present only one reasonable version of the facts, that is, Nurse McDonald acted in good faith in accordance with UAGA. There is evidence of more than a mere mistake, bad judgment, or understandable confusion on Nurse McDonald's part. Rather, as suggested above, the evidence is enough for one to find a conscious or intentional wrongdoing carried out for a dishonest purpose or furtive design.

Finally, this is not a case where the public policy behind UAGA compels a finding of immunity. Nothing in its history suggests that UAGA was intended to cutoff liability when physicians or hospitals knowingly or recklessly mislead family donors and frustrate the donors' actual and expressed wishes. Moreover, it seems that UAGA's policy goals are served when a family donor's consent is informed. The knowing misrepresentation of information needed to make a thoughtful and deliberate decision to donate is not conduct on the part of a hospital that publicly encourages the making of anatomical gifts or that protects and balances the conflicting interests "consistent with prevailing

---

4. St. Francis contends Nurse McDonald's testimony regarding her knowledge about the actual surgical procedures used to remove these tissues cannot be separated from her testimony denying she described the surgical procedures in the manner testified to by the plaintiffs. St. Francis refers to this testimony as a "homogenous body" or the "explanations for her denial" and insists that the testimony must be accepted or rejected as a whole. St. Francis cites no authority for such a rule or for it operating in these circumstances. Indeed, the court would be surprised if St. Francis could find any authority, since the issue here is really one of witness credibility. *See Hathaway v. Merit Systems Protection Bd.,* 981 F.2d 1237, 1241 (Fed.Cir.1992) (the finder of fact "is not obliged to accept or reject a witness' testimony *in toto,* but should rather evaluate the testimony in light of other evidence to determine whether and how much of the witness' testimony is credible." (citation omitted)); *Ater v. Culbertson,* 190 Kan. 68, 73–74, 372 P.2d 580 (1962) (the finder of fact gives a witness's testimony as much weight as it deserves and "may reject a part and believe a part of the testimony."). The court sees no inseparable evidentiary link between Nurse McDonald's testimony concerning what she learned from the in-service training and what she later told the Perrys. What Nurse McDonald had learned at in-service training is relevant in weighing her testimony about what she later told the Perrys. It is also relevant, however, in proving her knowledge and understanding of the actual surgical procedures to be used for donating body tissues.

customs and desires in this country." 8A U.L.A. 15. The defendant St. Francis is not entitled to summary judgment on its defense of good faith immunity pursuant to K.S.A. 65–3215(c).

## TORT OF OUTRAGE

■■■ Kansas recognizes the tort of intentional infliction of emotional distress or outrage. *Moore v. State Bank of Burden*, 240 Kan. 382, 388, 729 P.2d 1205 (1986), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). This tort creates liability when a person engages in extreme and outrageous conduct and thereby intentionally or recklessly causes severe emotional distress to the plaintiff. *Id.* The material elements in proving this tort are:

> (1) The conduct of the defendant must be intentional; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe.

*Id.* (citing *Hoard v. Shawnee Mission Medical Center*, 233 Kan. at 267, Syl. ¶ 3, 662 P.2d 1214). Besides these elements, there are two thresholds to liability determined by the court in the first instance. They are that "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and ... [that] the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Roberts v. Saylor*, 230 Kan. 289, 292–93, 637 P.2d 1175 (1981). When reasonable persons would differ over the answers to these threshold questions, the issue of liability is then for the jury to decide. *Dotson v. McLaughlin*, 216 Kan. 201, 211, 531 P.2d 1 (1975).

On this claim, St. Francis essentially just repeats its argument that the plaintiffs are without proof that anything more than an oversight or negligence occurred. New to this claim, St. Francis argues that the Kansas Supreme Court has been disinclined to find the facts to support such a claim and in *Burgess v. Perdue*, 239 Kan. 473, 721 P.2d 239 (1986), appears to have "rejected the idea

that the mere failure to communicate the limited nature of a consent to surgically invade a dead body" is outrageous conduct. (Dk. 122 at 23).

■ The court does not intend to repeat what it said about the plaintiffs' evidence that Nurse McDonald intentionally or recklessly misled them concerning the surgical procedures, consent form, and her intention to inform the retrieval team. Suffice it to say, the evidence is enough for a reasonable jury to find that the Nurse McDonald's conduct rises above a mere insult, indignity, or annoyance to the plaintiffs. This does not end the judicial inquiry. It still remains for the court to say whether a reasonable person could consider Nurse McDonald's conduct under these circumstances to be outrageous.

■■ Kansas case law supports the proposition that intentional misrepresentations can sustain a claim for intentional infliction of emotional distress. *See Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024 (1991) (defendant lied to police officers in reporting that the plaintiff had vandalized her car). The court does not read *Burgess* as rejecting an outrage claim based on the **intentional** failure to communicate a family member's limited consent to an autopsy. Indeed, the Kansas Supreme Court was asked only to decide whether the plaintiff could recover her emotional distress damages from Dr. Perdue for his **negligent** failure to relate her limited consent to an autopsy on her son. 239 Kan. at 477, 721 P.2d 239. The Kansas Supreme Court was not presented with allegations or supporting facts that because of the defendant's **intentional** or **reckless** acts the limited nature of the plaintiff's consent was later overlooked and overridden.

The court is not saying that all intentional or reckless misrepresentations will sustain an outrage claim. In fact, comment d to Restatement of Torts (Second) § 46 (1965) states in part:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. *It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended*

*to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.* Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" (Emphasis added); *see Hanke v. Global Van Lines, Inc.,* 533 F.2d 396, 398 (8th Cir.1976). The circumstances in which the misrepresentations are made is a significant factor. For example, "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement of Torts (Second) § 46 cmt. e (1965). Besides the defendant having a position of power, trust or authority, another factor is the defendant's knowledge that the plaintiff is susceptible to emotional distress due to a physical or mental condition or other circumstance. "The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge...." *Id.* at cmt. f.

The historical roots to an independent action for the tort of outrage are found in cases involving funerals, death messages, and the mishandling of corpses. *See Brown v. Matthews Mortuary, Inc.,* 118 Idaho 830, 801 P.2d 37, 40–41·(Idaho 1990); *Rubin v. Matthews Intern. Corp.,* 503 A.2d 694, 699 (Me. 1986). In keeping with that, courts traditionally work from the premise that it is foreseeable the immediate family will likely experience serious emotional distress from the mishandling of a loved one's dead body. *See Christensen v. Superior Court,* 54 Cal.3d 868, 820 P.2d 181, 2 Cal.Rptr.2d 79, 94 (Cal.1991) (mishandling of corpse is "likely to cause serious emotional distress ... regardless of whether they observe the actual ... conduct or injury to the remains of their decedent");

*Alderman v. Ford,* 146 Kan. 698, 702, 72 P.2d 981 (1937) ("'That mental suffering and injury to the feelings would be ordinarily the natural and proximate result of knowledge that the remains of a deceased husband had been mutilated, is too plain to admit of argument.'" (quoting *Larson v. Chase,* 47 Minn. 307, 312, 50 N.W. 238 (1891)); *Rubin,* 503 A.2d at 699 n. 6 ("The defendant's conduct in cases where such damages have historically been awarded for intentional infliction of emotional distress has been more closely associated with the burial services or the dead body." (citations omitted)). In short, the courts have appreciated the emotional stress caused from grieving a loved one's death and have viewed the grieving family members as emotionally susceptible with regards to their feelings towards the decedent's remains.

The facts of this case could support findings that Nurse McDonald knew of the Perrys' emotional vulnerability and occupied a position of authority or trust towards them. Only minutes after being told that her husband and their father had died from a sudden and unexpected heart attack, Mary Ann Perry and her children remain together in the waiting room comforting each other. Nurse McDonald walks into the waiting room offering them her comfort and consolation. The Perrys, appreciating her concern, experience and medical training, ask Nurse McDonald what next must be done. Assuming a position of some authority and trust with the Perrys, Nurse McDonald leads them through the difficult decisions immediately facing them. When questions arise regarding the surgical procedures and consent forms for tissue donations, Nurse McDonald answers them appreciating that the plaintiffs are relying on her apparent medical training and knowledge. Instead of giving truthful answers, Nurse McDonald, according to the plaintiffs, intentionally misled them into consenting to a tissue donation that exceeded their expressed wishes.

Accepting the plaintiffs' testimony, the court believes a reasonable person looking at this situation could exclaim, "Outrageous!" Nurse McDonald's conduct could be said to have exploited a position of trust and respect gained from a emotionally vulnerable family.

Nurse McDonald knew the plaintiffs decision to donate only the corneas and the bone marrow was based on what they perceived Kenneth's wishes would have been had he known about the surgical procedures as explained by Nurse McDonald. She repeatedly lied about the limited surgical procedures, the effect of marking and signing the consent form as they did, and her intention to alert the retrieval team about the limited donation. This deception resulted in not only the mutilation of Kenneth's remains but frustrated the family's effort to act as a guardian over the remains and donate only what they believed Kenneth would have wanted. Of almost equal importance are the conclusions that Nurse McDonald's conduct was an abuse of the organ donation process and a betrayal of a grieving family's trust. Finally, the evidence is sufficient for a finding that Nurse McDonald acted in reckless indifference to the Perrys' trauma. St. Francis is not entitled to summary judgment on the intentional infliction of emotional distress claim.[5]

## BREACH OF CONTRACT

■ St. Francis attacks this claim on several different levels. It challenges the plaintiffs' proof of any alleged agreement between Mary Ann Perry and St. Francis and any alleged agreement between the adult children and St. Francis. It challenges the alleged agreement as unenforceable for public policy reasons. It challenges the plaintiffs' proof of any recoverable damages on their breach of contract claim.

In their briefs, the plaintiffs outline their understanding of this alleged contract:

In the present case the subject matter of the contracts is the corneas and bone marrow of Kenneth Perry. There was an offer made by Nurse McDonald on behalf of defendant St. Francis and the undisclosed principal, defendant Red Cross, to the Perrys after some negotiation. The "offer" was that the family of Kenneth Perry would donate tissue of Kenneth Perry.

The plaintiffs accepted the offer as orally conveyed to them by Nurse McDonald that they could donate the corneas of Kenneth Perry and Kenneth Perry's bone marrow. The plaintiffs, based upon the assurances of Nurse McDonald relative to the procedure each donation entailed, agreed and accepted the terms of the contracts.

The consideration of the contracts were (sic) the corneas and bone marrow of Kenneth Perry. For purposes of the case at bar, the only consideration we are alleging relates to the obtaining of the tissue of Kenneth Perry....

(Dk. 137 at 21). The plaintiffs' allegations and arguments regarding this purported contract are confusing and less than satisfying.[6]

The plaintiffs' breach of contract claim is an effort to force a square peg into a round hole. In their designated deposition testimony, the Perrys do not describe the consent form as functioning anything like a contract. The consent form simply memorializes their consent to donate. It does not purport to set forth any particular rights and duties of the parties like a written contract would be expected to do. The conversations regarding the tissue donations, as described by the plaintiffs and Nurse McDonald, indicate little more than the plaintiffs' efforts to inform themselves in the exercise of their consent to donate. The conversations hardly resemble contract negotiations over such subjects as performances, consideration, and remedies. At best, the facts are that the plaintiffs executed a consent form for the donation of Kenneth's eyes and bones after receiving assurances from Nurse McDonald that they were actually donating just the corneas and bone marrow and that the actual surgical procedures would not result in the removal of either the entire eyes or the whole bones. The court rejects the plaintiffs' attempts to construct an enforceable contract from these facts.

---

5. In a single sentence, St. Francis asserts "the distress that was suffered cannot be said to be so severe that no reasonable person could be expected to endure it." (Dk. 122 at 25). The court does not credit this single sentence as an argument of any merit or substance.

6. It is clear, however, that the plaintiffs do not allege a contract with St. Francis for the proper handling and care of the dead body. In other words, one cannot compare this alleged contract to the typical agreement with a mortuary or carrier for services relating to the dead body.

■ Mary Ann Perry does not establish that her property right in Kenneth's body includes a right to convey it for consideration. As the court previously held, Kansas law considers Mary Ann Perry to be the exclusive owner of a quasi-property right in the body, namely, the right to possess it for the limited purposes of preserving and burying it. 865 F.Supp. at 726–27. Kansas common law on this matter is no different from the position universally held by other states which recognizes no property right, commercial or material, in the corpse itself but only a right of possession in order to dispose of the corpse appropriately. *See Dougherty v. Mercantile–Safe Deposit & Trust Co.,* 282 Md. 617, 620 n. 2, 387 A.2d 244 (Md.1978) ("It is universally recognized that there is no property in a dead body in a commercial or material sense."); *see, e.g., Strachan v. John F. Kennedy Memorial Hosp.,* 109 N.J. 523, 538 A.2d 346, 350 (N.J.1988); *Hearon v. City of Chicago* 157 Ill.App.3d 633, 110 Ill.Dec. 161, 164, 510 N.E.2d 1192, 1195 (Ill.App.Ct. 1987); *State v. Powell,* 497 So.2d 1188, 1191–92 (Fla.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 856 (1987); *Georgia Lions Eye Bank, Inc. v. Lavant,* 255 Ga. 60, 335 S.E.2d 127 (1985), *cert. denied,* 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 721 (1986); *Beaulieu v. Great Northern Ry. Co.,* 103 Minn. 47, 114 N.W. 353, 355 (1907). This "'dubious "property right" to the body, ... cannot be conveyed, can be used only for the one purpose of burial, and not only has no pecuniary value but is a source of liability for funeral expenses.'" *Powell,* 497 So.2d at 1192 (quoting W. Prosser, *The Law of Torts,* 43–44 (2d ed. 1955) (footnotes omitted)).

As far as the adult children's breach of contract claim, the court agrees with St. Francis that they have not come forth with sufficient proof of any contract existing between them and any agent of St. Francis regarding tissue donations from Kenneth's body. The plaintiffs offer no evidence of record that the adult children agreed to support their mother's decision to donate in exchange for any act or forbearance by St. Francis. A party cannot successfully resist summary judgment with mere allegations.

■ A contract approach to organ and tissue donation is not reconcilable with societal beliefs and values on this subject.[7] UAGA embodies [8] "a commitment to the belief that organs should be given as a gift, either to a specific individual or to society at large." *Developments in the Law–Medical Technology and the Law,* 103 Harv.L.Rev. 1519, 1622 (1990). The same is reflected in federal law at 42 U.S.C. § 274e, which prohibits the "transfer [of] any human organ[9] for valuable consideration for use in human transplantation" but permits reasonable payments for the costs associated with organ procurement and use. 42 U.S.C. § 274e(a).

---

7. One court has noted "that laws regarding the removal of human tissues for transplantation implicate moral, ethical, theological, philosophical, and economic concerns which do not readily lend themselves to analysis within a traditional legal framework." *State v. Powell,* 497 So.2d 1188, 1194 (Fla.1986). For that reason, the courts should look instead to the particular statutes that were written on those subjects in an effort to balance the peculiar interests involved. Recently, the California Supreme Court said that courts should not look to conversion law but to the specialized statutes dealing "with human biological materials as objects sui generis, regulating their disposition to achieve policy goals rather than abandoning them to the general law of personal property." *Moore v. Regents of the University of California,* 51 Cal.3d 120, 271 Cal.Rptr. 146, 156, 793 P.2d 479, 489 (Cal.1990), *cert. denied,* 499 U.S. 936, 111 S.Ct. 1388, 113 L.Ed.2d 444 (1991). The same could be said for resorting strictly to contract law when there is an alleged agreement for the transfer of human remains.

8. UAGA refers to the organs and tissues exclusively as donations or gifts. UAGA has been "widely interpreted as implying the illegality of organ sales at least to the extent of making unenforceable contracts for sale." Lloyd R. Cohen, *Increasing the Supply of Transplant Organs: The Virtues of a Futures Market,* 58 Geo.L.J. 1 (1990). The 1987 version of UAGA expressly prohibits the purchase or sale of a body part for transplantation or therapy. *Unif. Anatomical Gift Act (1987),* 8A U.L.A. 25 at § 10(a).

9. Congress defined "human organ" to include: "kidney, liver, heart, lung, pancreas, bone marrow, cornea, eye, bone, and skin or any subpart thereof and any other human organ ... specified by the Secretary of Health and Human Services by regulation." 42 U.S.C. § 274e(c)(1). A violation of § 274e carries a maximum sentence of five-years imprisonment and a $50,000 fine.

For whatever reason, whether it be metaphysical, religious, or philosophical, society presently rejects the commercialization of human organs and tissues and tolerates only an altruistic system of voluntary donation. *Developments*, 103 Harv.L.Rev. at 1624. Because society accepts the exchange of human body parts only when based on a gift model, courts should be reluctant to recognize a cause of action that contravenes this fundamental public philosophy.[10]

Assuming for the sake of argument that public policy were otherwise, the plaintiffs do not allege or prove any damages recoverable under Kansas law for a breach of contract claim.[11] On a breach of contract claim, " 'the damages recoverable are those which might reasonably have been anticipated by the parties and are limited to pecuniary loss which naturally occurs as a proximate result of the breach.' " *Atkinson v. Orkin Exterminating Co.*, 5 Kan.App.2d 739, 744, 625 P.2d 505 (quoting *Hess v. Jarboe*, 201 Kan. 705, 708, 443 P.2d 294 (1968)), *aff'd*, 230 Kan. 277, 634 P.2d 1071 (1981); *see Temmen v. Kent–Brown Chev. Co.*, 227 Kan. 45, 51, 605 P.2d 95 (1980). The court finds no allegations or proof of contract damages that come within this well-established rule.

Mental pain and suffering are "nonpecuniary damages." *Bowman v. Doherty*, 235 Kan. at 874, 686 P.2d 112. The general rule is that a dead body has no pecuniary value to the surviving next of kin. *Powell*, 497 So.2d at 1192; *see Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 880 (Colo.1994). The plaintiffs allege a figure of $22,701 which the court understands to be the value attributed by the defendant Red Cross after it had retrieved, processed, and stored the bone tissue. The plaintiffs lack any basis in fact or law for equating their value in the tissue with that value created by the Red Cross in preparing the tissue for transplant. Nor do the plaintiffs attempt to prove the tissue has any market value relevant to them. Because the eyes and tissue have been or will be soon distributed for medical use, the plaintiffs will not have any costs or expenses in burying the tissue. For these reasons, the court finds that the plaintiffs have no recoverable damages on their breach of contract claim.

## NEGLIGENCE

On this claim, St. Francis simply incorporates by reference its factual arguments advanced on the good faith immunity defense

10. What legal recourse does a family member have when the donee accepts but then ignores the conditions of an organ donation? UAGA recognizes the possibility of the family member donor attaching certain terms or conditions to an organ donation. UAGA further imposes certain duties on the donee with respect to a donation. Specifically, K.S.A. 65–3215(a) provides:

The donee may accept or reject the gift. If the donee accepts a gift of the entire body, he may, subject to the terms of the gift, authorize embalming and the use of the body in funeral services. If the gift is of a part of the body, the donee, upon the death of the donor and prior to embalming, shall cause the part to be removed without unnecessary mutilation. After removal of the part, custody of the remainder vests in the surviving spouse, next of kin, or other persons under obligation to dispose of the body.

UAGA plainly contemplates that the nature of the exchange does not change from a gift even if the donation is made on certain terms or conditions. If the donee accepts the gift on the conditions offered, then the donee's duty to exercise reasonable care in performing those conditions would exist presumably under Restatement (Second) of Torts § 323. Section 323 provides that one who undertakes to render services either gratuitously

or for consideration to another which should be recognized as necessary for the protection of the other person or his things is liable for not acting with reasonable care. *See Wicina v. Strecker* 242 Kan. 278, 285, 747 P.2d 167 (1987). The donee should recognize that the performance of conditions attached to an organ donation would be for the protection of the feelings and emotions of the surviving relatives. In *Burgess v. Perdue*, 239 Kan. at 481, 721 P.2d 239, the court found that while the physician had no duty to obtain the plaintiff's consent for an autopsy on the plaintiff's son's body, the physician voluntarily undertook to ask for consent and thereby "assumed a duty to relay the plaintiff's limitation to the autopsy." *See Wicina*, 242 Kan. at 285, 747 P.2d 167. It follows that when a donee fails to exercise reasonable care in performing the accepted conditions of an organ donation, the donor and related parties would have legal recourse against the donee on a theory of an affirmative undertaking pursuant to § 323.

11. Indeed, the plaintiffs do not respond or even refer to this argument by St. Francis. By not responding, the plaintiffs waive their right to brief the argument later, and the court may treat the defendant's motion as uncontested on this issue. *See* D.Kan.Rule 206(g).

and the tort of outrage claim. On both matters, the court found genuine issues of material fact to exist. It follows then that genuine issues of material fact exist as to whether Nurse McDonald's actions were willful or wanton. St. Francis is not entitled to summary judgment on this claim.

IT IS THEREFORE ORDERED that St. Francis' motion for summary judgment (Dk. 121) is granted on the plaintiffs' breach of contract claim and is denied in all other respects.