323 P.2d 955

Delcie L. HALE, Appellant,

v.

Gordon N. BROWN and Curtis Page, dba Brown & Page Mortuary, and American Zinc, Lead & Smelting Co., a corporation, Appellees.

No. 6212.

Supreme Court of Arizona.

April 9, 1958.

Herbert B. Finn, Phoenix, for appellant.

Snell & Wilmer, Phoenix, for appellee mortuary.

McCarty & Chandler, Tucson, for corporate appellee.

UDALL, Chief Justice.

The trial court found, after considering the voluminous record before it—which included the pleadings, depositions, transcripts of two hearings before the Industrial Commission (108 pages), the transcript (45 pages) of a so-called coroner's inquest held some nine months after death, and several affidavits—that there were no genuine issues as to any material fact to be tried, and hence it held both defendants were entitled to judgment as a matter of law. This appeal followed

A chronological factual statement of the uncontroverted facts is necessary to a proper understanding of the real problem presented by this appeal. On a motion for summary judgment, it is rare that we have as complete a record as is presented in this case.

William Allan Hale died June 23, 1952, while employed at the Hilltop mine near Portal, Arizona, by American Zinc, Lead and Smelting Company (being one of the defendants-appellees to this action), hereinafter referred to as either the "employer" or "American Zinc". Decedent became ill and died during the lunch hour, shortly after coming to the surface. Death ensued before any medical aid arrived.

Shortly thereafter Dr. M. C. Pugsley, a local retired army doctor who was acquainted with and had treated decedent during his lifetime, appeared and after making some inquiries and a cursory examination of the body diagnosed the cause of death as "acute cardiac failure". T. W. Cooke, Justice of the Peace and ex officio coroner of the adjacent Bowie precinct, stated he was called on June 23, 1952 by the Sheriff's office and was told that Coroner

Martin of Douglas was not available; hence he was requested to get a doctor and go to the Hilltop mine where a man had died. They arrived there about 3:30 p. m. Dr. Farrish examined the body of decedent and concluded he had died of natural causes (cardiac trouble) and that there was no need for an inquest. The doctor issued a permit for removal of the body—making a notation thereon that the body was to be held for an autopsy (this latter point was disputed)—as at that time the mine superintendent indicated the employer would probably want such an examination. Late that afternoon Gordon N. Brown, one of the co-owners of the Page & Brown Mortuary of Douglas (the other defendant-appellee), hereinafter referred to as "Mortuary", came to the mine for the express purpose of removing the body to the Mortuary. Marian Howard, the 27-year-old married daughter of decedent, who at the time was handling the arrangements, had called Gordon N. Brown and requested that he do so. While at the mine Brown was handed the removal permit issued by Dr. Farrish. The body was removed to the Mortuary and immediately thereafter (at about 7 p. m.), without express authorization from the coroner or any member of decedent's family, the Mortuary took the preliminary steps in embalming by injecting a preservative fluid. Undertaker Brown admits he had no express authorization to do this but seeks to justify such action by pointing out that it was summertime, decomposition had set in and that customarily in the trade morticians do not bother to obtain authorization from the family to embalm. Upon her examination at the coroner's inquest Marian Howard stated her brother was present on that occasion and there is no showing that he objected thereto.

Dr. Alessi of Douglas, the Hale family physician, stated he was advised the family wanted a post-mortem examination for the purpose of determining the cause of death, particularly as to whether decedent had suffered gas poisoning. Upon inquiry he found the employer was no longer insisting on an autopsy nor would it pay for same. He advised the family to get a qualified pathologist and was instructed to call Dr. George O. Hartman of Tucson, which was done that evening. By the next morning at 8 a. m. there was delivered to the Mortuary a written authorization, signed by the widow, for such post-mortem examination. At about 5:30 p. m. on June 24th, Dr. Hartman arrived at the Mortuary and in the presence of two local doctors, Dr. Alessi and Dr. Guy B. Atonna, this specialist performed a routine autopsy and his diagnosis as to cause of death was: 1. coronary occlusion; 2. arteriosclerosis. It manifestly appears that Dr. Hartman made the post-mortem examination completely at the direction of plaintiff and none of the defendants had anything to do with such

examination. After that the Mortuary completed the embalming without objection on the part of anyone, a funeral was held and the body was buried. The certificate of death dated June 26, 1952 and signed by Dr. Alessi, gives the cause of death as "coronary thrombosis".

On August 20, 1952 a claim for death benefits under the Workmen's Compensation Act, A.R.S. § 23-901 et seq. was filed with the Industrial Commission by decedent's widow and a minor son, on the theory that decedent came to his death as a result of an accident arising out of and in the course of his employment. After several hearings the Commission, on November 23, 1953, reaffirmed its previous awards denying compensation. On review we affirmed on the basis of a procedural defect that made the award res judicata. Hale's Estate v. Industrial Commission, 78 Ariz. 202, 277 P.2d 1014.

An unverified complaint, in the instant case, was filed against defendants on September 29, 1953 by the widow, Delcie L. Hale, and decedent's three children by a previous marriage—only one of whom was then a minor. It appears from the motion to set aside summary judgment that at the hearing on the motion for summary judgment the court ordered stricken the names of the three children as party plaintiffs, thereby leaving the widow (being the real party in interest) as the sole plaintiff. No assignment of error is predicted upon this ruling. Therefore Delcie L. Hale will be referred to either as the plaintiff or widow. While there is only one count to the complaint, on the face thereof it does appear to have two elements, (1) a charge of wrongful embalmment against the Mortuary, and (2) that defendants, Mortuary and American Zinc, conspired to embalm the body of decedent in order to remove and suppress evidence as to the cause of death so that plaintiffs would be unable to obtain death benefits under the Workmen's Compensation Law. Actually, as will be shown, the two matters are inextricably entwined. In any event the complaint was held sufficient by the trial court, as against defendants' separate motions to dismiss for failure to state a claim upon which relief could be granted. The correctness of that ruling is not an issue to be determined by this appeal. Both answers were in effect general denials. Thereafter defendants made separate motions for summary judgment, and on June 6, 1955 a hearing was had thereon at the conclusion of which both motions were granted. The following day a formal judgment was entered that plaintiff take nothing. This appeal followed.

▇▇▇ Plaintiff's first assignment of error is that the court was without jurisdiction to grant either of the motions for summary judgment because the Mortuary had not complied with the provisions of

Rules Civil Procedure, Rule 56(c), 16 A. R.S. (then section 21-1212 A.C.A.1939) which required that such a motion, with its supporting affidavits, be filed ten days prior to a hearing thereon. No authority is cited in support of this contention, furthermore this objection is being raised here for the first time. The record is devoid of any objection on the part of plaintiff to this early hearing nor was a motion for continuance made. It is well settled that a party cannot gamble on the court's ruling by submitting a matter without objection and then, following an adverse ruling complain. It is interesting to observe that the transcripts of prior hearings, and many of the affidavits now relied upon by the parties were introduced on the day of the hearing. Furthermore it was not until that day that the plaintiff's complaint, now so strongly relied upon, was belatedly verified by Marian Howard, the married daughter. We hold there is no merit to this assignment, as the failure of the Mortuary to strictly comply with this rule of court was not jurisdictional.

Considering next the validity of the trial court's granting of summary judgments in favor of defendants. This matter was governed by Rule 56(c), Rules Civil Procedure as it then appeared in Section 21-1212, A.C.A.1939. There have been numerous pronouncements of this court interpreting this Rule, determining when a motion for summary judgment should or should not be granted:

"The law is well settled that a summary judgment should never be entered unless the facts are clear and undisputed. If there is a controversy on a factual question, judgment should be withheld until proof has been made." Phoenix Feed & Seed Co. v. Adams, 78 Ariz. 292 at page 293, 279 P.2d 447, 448.

"The facts alleged in the complaint are not the sole factors to be considered in passing on the motion for summary judgment; all those shown by the record as it stands when the motion is made, or submitted, enter into the matter." Suburban Pump & Water Co. v. Linville, 60 Ariz. 274, at page 283, 135 P.2d 210, 213.

Justice Windes, speaking for a unanimous court in the case of Stevens v. Anderson, 75 Ariz. 331, at page 333, 256 P.2d 712, 713, gives a most comprehensive statement of the governing principles that are directly apropos to our problem in the present case, viz.:

"When motion for summary judgment is presented, it becomes the duty of the trial court to examine the entire record and determine whether there is any disputed material fact which if true could have a bearing on the kind of final judgment which under the law

should be rendered. If it appears that competent evidence will be submitted tending to prove or disprove such material fact, the determination of the existence thereof must depend upon the evidence submitted at the trial. *The court does not try issues of fact, but only whether the same are genuine and in good faith disputed. The mere general statement in a pleading, when attacked by such motion supported by proof of specific facts in the form of affidavit or deposition, places on the author of the statement the obligation to present something which will show that when the date of trial arrives, he will have some proof to support the allegation in the pleading.* He cannot withhold this showing until the time of trial. He has not the right to say that he has made a negative or contradictory allegation and has therefore created a genuine issue and might have evidence to support it. \* \* \* To permit such proceeding would defeat the very purpose of summary judgment practice. \* \* \* *This practice was established for protection against compelling one to submit to the delay, expense and harassment of litigation upon mere assertions, when it is shown that competent evidence cannot be presented to prove same.*" (Emphasis supplied.)

With these yardsticks to guide us let us first determine whether, from the entire record, there is in truth and in fact a bona fide claim for relief against the Mortuary solely for wrongful embalmment of decedent's body. As an abstract proposition counsel for the Mortuary concedes that by the great weight of authority a cause of action will lie for wrongful embalming. See, 15 Am.Jur., Dead Bodies, section 6; and this right vests in the surviving spouse, section 9 (15 Am.Jur., supra). The following from the Restatement of Torts, section 868 "Interference with Dead Bodies", comment b, states the basis upon which recovery is usually allowed:

"The cause of action *is primarily for mental suffering caused by the improper dealing with the body.* It includes also the right to recover damages for physical harm resulting from such mental suffering." (Emphasis supplied.)

If this were actually a cause of action for wrongful embalming the complaint would doubtless have indicated wherein the wrongful act caused mental anguish. Surely, somewhere in this voluminous record, all of which was presumably considered at the hearing on the motions there would be facts stated that would indicate the claimed wrongful mutila-

tion or indignities inflicted upon the body of decedent. There is nothing resembling such a claim anywhere in the record. There is nothing to show or indicate displeasure with the Mortuary's technique of embalming; that plaintiff did not intend this Mortuary to embalm the body or that any objection was made to the completion of the embalming after the autopsy and before burial; that such acts caused any mental anguish or suffering as a result of the alleged improper dealing with decedent's body. The *only* grievance complained of is that the body was embalmed without express permission, prior to the autopsy, thus preventing their obtaining an unadulterated blood sample so as to establish decedent died from gas poisoning. That the *time of embalming and not the wrongfulness thereof* is the gist of the complaint is shown by the admissions of plaintiff in her deposition:

"Q. Did any of the children ever complain to you about the body being either dissected, cut up, mutilated, abused or maltreated? A. No.

"Q. They never made any complaint in that regard? A. No, they was with me.

"Q. *As far as you are personally concerned, the only complaint you have about the entire manner in which the autopsy or the embalming was handled, is that you did not get a sample of* blood, *is that correct?* A. *That's right.*

"Q. And that was to enable you to process your claim against the Industrial Commission? A. Yes.

"Q. That's the only grievance you have, and the children has, as far as you know from talking to them, is that correct? A. Uh, huh." (Emphasis supplied.)

This testimony of plaintiff completely destroys her present contention that there is shown a simple cause of action for wrongful embalming. It becomes crystal clear, when the complaint is carefully unveiled, that the gravamen of the action is the charge, lodged against both defendants, of conspiring to suppress evidence as to the real cause of death by embalming the body prior to a post mortem examination, thereby absolving American Zinc of any blame for decedent's death.

As to that averment let us examine the record and see whether the plaintiff, if motions for summary judgment were denied, would at time of trial have some competent proof to support such allegations. Stated in another way, did the premature embalming make it impossible for Dr. Hartman, plaintiff's pathologist, to conclusively determine the cause of Hale's death because of his inability to obtain specimens of untainted blood?

The defendant took the deposition of Dr. Daniel J. Condon, which was admitted in evidence at the hearing. This doctor, whose preeminent qualifications are well known, is the Maricopa County Medical Examiner and during the previous three years had performed more than five hundred autopsies. We quote excerpts from his testimony relevant to this precise point, viz.:

"Q. Is there any absolute way of determining after death whether a person has been subjected to carbon monoxide or gas? A. * * * But the general way is the determination by chemical or analytic means of the presence of carbon monoxide hemaglobin in the blood of the individual so poisoned.

\* \* \* \* \* \*

"Q. *Doctor, in your opinion could that amount or could enough blood be obtained from a dead body to perform a test to ascertain the existence of carbon monoxide in the blood after a person had been embalmed?* A. *Yes, it is generally agreed that that can well be done.*

"Q. Would it be your opinion that enough blood could be obtained after embalming to make that test? A. Yes.

"Q. And, generally speaking, Doctor, where could that blood be obtained from, what part of the body? A.

Well, it would be easily obtained from the heart, usually.

"Q. Are there any other parts of the body that it also might be obtained from? A. Almost any portion usually of the arterial tree of the body or from the muscles, possibly from the liver.

"Q. In your practice have you ever had occasion to obtain a sample of blood from a body that has been embalmed? A. For that purpose?

"Q. For any purpose. A. Yes.

\* \* \* \* \* \*

"Q. Doctor, assume that a man died on the 23rd of June and that the body had been embalmed by a method known as arterial embalming and that an autopsy was performed at 5:30 p. m. on the day following; assume further that the man had died around noon on the 23rd of June; in your opinion would the embalming process preclude a later determination as to the presence or absence of carbon monoxide poisoning?

A. I didn't quite understand the word 'later'. You mean at the time of the autopsy?

"Q. At the time of the autopsy. A. *No, it would not.*

"Q. And, Doctor, in your experience as a medical man, *have you ever had occasion after a person has been*

*embalmed* to perform a test to determine whether or not the person had been subjected to carbon monoxide gas or poisoning? A. I have caused tests to be made.

"Q. And could the presence or absence of carbon monoxide poisoning be determined? A. Yes." (Emphasis supplied.)

Dr. Hartman, plaintiff's own pathologist, testified at one of the hearings before the Industrial Commission that he made the diagnosis of cause of death with the "thought in mind" it may have been due to the "possibility of exposure to some kind of gas". Not knowing the type of gas he made a microscopic examination of the tissues to see if there was any indication of an irritant gas. He testified that the embalming could not have any effect on that test. He makes no statements or claims that embalming hampered him in any way or that he was unable to obtain a suitable sample of blood. He states he made no test for carbon monoxide poisoning and the reason for not making such a test does not appear save he was testing for irritant gases. He was asked the following questions:

"Q. In performing this autopsy, Dr. Hartman, did you perform a routine autopsy? A. Yes.

"Q. You made no special tests? A. Only the microscopic examination of the tissues, as I always do.

"Q. And that you did routinely too? A. Yes."

Dr. Guy B. Atonna testified at the coroner's inquest that the reason for the autopsy was the possibility of gas poisoning. He, too, was present at this post-mortem examination.

How does the plaintiff meet this medical evidence, in this highly technical field, so as to show the trial court there was a real issue to be tried, and that a motion for summary judgment should not be granted? She offered no medical evidence whatsoever. The only controverting affidavit as to this issue of inability to obtain "untainted" blood is an affidavit of Marian Howard, dated and filed the day of the hearing, wherein it is recited:

"That she is one of the foregoing plaintiffs; that she has read the complaint filed in this action and that the allegations therein are true."

Up until that moment the complaint, which had been filed one year, eight months and seven days previously, stood unverified. Concededly the complaint did specifically allege that by reason of the wrongful embalming it became impossible to determine conclusively the cause of decedent's death.

We submit such a showing wholly fails to meet the requirements laid down in Stevens v. Anderson, supra.

■ Inasmuch as the plaintiff wholly failed to show a genuine issue of fact, it would appear to be pointless to discuss the alleged conspiracy or the law governing such matters. Suffice it to say plaintiff did not in the entire record, present a scintilla of evidence refuting the positive showing made by defendants. Therefore, no factual issue was created to indicate there was a suppression of evidence or that American Zinc controlled or had anything to do with the action taken by Mortuary in prematurily embalming the body. Furthermore, there is no such thing as a civil action for a conspiracy. The action is one for damages arising out of the acts committed pursuant to the conspiracy. Cole v. Associated Construction Co., 141 Conn. 49, 103 A.2d 529, 40 A.L.R.2d 1105. See also 11 Am.Jur. 577, Conspiracy, Sec. 45. Plaintiff apparently recognizes this deficiency because he devotes less than one page in both briefs to the matter of conspiracy.

Judgment affirmed.

WINDES and JOHNSON, JJ., concur.

PHELPS and STRUCKMEYER, Justices (dissenting).

Our major point of departure from the majority takes place in their treatment of the second assignment of error and begins with what constitutes, and what is the nature of, the real cause of action involved in this case. However, before launching into a discussion of our differences in that regard, we must clarify another minor point of disagreement that involves whether we are dealing with "plaintiffs" or "plaintiff" on this appeal. The majority opinion maintains that the court ordered stricken the names of decedent's three children as party plaintiffs, thereby leaving the widow, Delcie L. Hale, as the sole party plaintiff. It relies upon a statement contained in the motion to set aside summary judgment. We find no evidence in the record to support this statement. The record on appeal contains no minute entry of an order to strike the names of any of the plaintiffs. Without such a minute entry we refuse to regard Delcie L. Hale as the sole party plaintiff and will hereafter use the word "plaintiffs" in reference to her and decedent's three children as party plaintiffs. We shall use the same designation as that used in the majority opinion when referring to the defendants, viz., the Mortuary and American Zinc.

Although not so designated, the majority opinion begins its consideration of plaintiffs' second assignment of error when it discusses the validity of the trial court's granting of summary judgment in favor of defendants. Plaintiffs' second assignment of error asserts that the trial court erred in granting defendants' motions for summary judgment because issues of fact remained to be tried to the

court and jury. § 21–1212, A.C.A.1939, (the statute providing for summary judgment at the time of the hearing) provides in pertinent part that the court shall render the summary judgment sought if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that no genuine issue as to any material fact remains, and that the moving party thereby becomes entitled to a judgment as a matter of law. To determine whether issues of fact remained on this record, and, if not, whether the defendants, the moving parties, thereby became entitled to a judgment as a matter of law, we must consider the nature of the cause of action under which the complaint states a claim.

The majority opinion does not look upon the complaint as establishing a cause of action for wrongful embalming because the complaint does not indicate "wherein the wrongful act caused mental anguish" and the record does not contain statements of fact indicating "wrongful mutilation or indignities inflicted upon the body of decedent." A cause of action for wrongful embalming does not require any such allegations or proof. The wrongfulness does not result from the manner in which the embalming was accomplished. The wrongfulness results from the lack of authority to embalm, though the manner in which the embalm-ing was accomplished be completely proper. The mere act of embalming without authority interferes with the right of the next of kin to have the decedent's body in the condition in which it was when death supervened. This is the rationale of the cause of action for wrongful embalming as the following quotations from leading cases and authorities reveal.

"* * * The important fact is that the custodian of it [the corpse] has a legal right to its possession for the purposes of preservation and burial, and that _any interference_ with that right by mutilating _or otherwise disturbing_ the body is an actionable wrong. And we think it may be safely laid down as a general rule that an injury to any right recognized and protected by the common law will, if the direct and proximate consequence of an actionable wrong, be a subject for compensation.

"It is also elementary that while the law as a general rule only gives compensation for actual injury, yet whenever the breach of a contract or the invasion of a legal right is established, the law infers some damage, and, if no evidence is given of any particular amount of loss, it declares the right by awarding nominal damages. Every injury imports a dam-

age. Hence the complaint stated a cause of action *for at least nominal damages.*" Larson v. Chase, 47 Minn. 307, 50 N.W. 238, 239, 14 L.R.A. 85. (Emphasis added.)

"* * * The right is to the possession of the corpse in the same condition it was in when death supervened." Foley v. Phelps, 1 App.Div. 551, 37 N.Y.S. 471, 474.

"It is not a defense to say that the embalming was beneficial and necessary. Although embalming is generally recognized as a proper service. Konecny v. Hohenschuh, 188 Iowa 1075, 173 N.W. 901, no one but the person entitled to the dead body has the right to provide such service. He is entitled to the body in the condition it was in at death and to bury it in that condition without embalming if so advised. Here the evidence would sustain a finding not only of *embalming without authority,* but wrongful withholding of the body as well.

\* \* \* \* \* \*

"*That the plaintiffs later had the* body embalmed is no defense. The damage and hurt resulting from the wrongful acts of defendants were complete before plaintiffs had the body embalmed by their undertaker. Just how a subsequent embalming the body by plaintiffs' undertaker operates to satisfy or wipe out the cause of action for mental suffering and injured feelings resulting from defendants' prior *trespass on* and the withholding of the body, which plaintiffs had, has not been made to appear. If plaintiffs had not had the body embalmed by their own undertaker, there could be no question as to their right to recover. By having the body embalmed they did not release or relinquish the cause of action which they then had. Plaintiffs were entitled to recover if the jury adopted their version of the facts unless the acts were done by the coroner or under his direction with lawful authority." Sworski v. Simons, 208 Minn. 201, 293 N.W. 309, 311. (Emphasis added.)

"A person who wantonly mistreats the body of a dead person *or who without privilege intentionally* removes, withholds or *operates upon the dead body* is liable to the member of the family of such person who is entitled to the disposition of the body." Restatement, Torts § 868 (1939). (Emphasis added.)

"* * * The right to maintain an action for intentional interference with the body exists although there was no intent to do a tortious act,

* * *." Restatement, Torts, supra, comment a.

The above quotations also make it clear that wrongful embalming is a wilful tort, actionable per se, for which recovery of nominal damages may be had without proof of actual damages.

Viewed in this light, whether the Mortuary had authority to embalm the body becomes the only question pertinent to whether the Mortuary became entitled to a summary judgment on plaintiffs' wrongful embalming claim. If the record shows that it had authority, then it was entitled to summary judgment on this claim. If the record shows that a genuine issue remained as to whether it had authority, or if the record shows that it did not have authority, then it was not entitled to summary judgment on the claim. The record shows that the Mortuary did not have authority. In sworn testimony at the coroner's inquest, Gordon Brown admitted that he did not get anybody's permission to embalm the body and that the Mortuary had embalmed the body even before the autopsy authorization (which he had asked Delcie Hale to sign) was returned to him. We agree with the majority that on the record no genuine issue as to a material fact remained, but we assert that the plaintiffs thereby became entitled to a judgment as a matter of law on this wrongful embalming claim if they had so moved, for as least nominal damages. To allow defendant Mortuary's motion for summary judgment to defeat plaintiffs' right to a judgment for nominal damages represents a travesty upon the well-established and deeply-rooted legal principle that a person has the right to vindicate any trespass upon his legal rights by an action in tort for at least nominal damages.

We agree with the majority that under the rule of Stevens v. Anderson, 75 Ariz. 331, 256 P.2d 712, the plaintiffs' failure to meet their obligation to make some showing that they would have proof of damages and proof of the conspiracy at trial time was fatal to their so-called conspiracy claim against the Mortuary and American Zinc. However, under no conception of the law (neither under the authority of Stevens v. Anderson, supra, nor otherwise) can it be said that this record entitled the Mortuary to a judgment as a matter of law on the wrongful embalming claim. Thus we would affirm the judgment as to all defendants on the so-called conspiracy claim, but would reverse the judgment as to the Mortuary on the wrongful embalming claim.