972 P.2d 658

**Lucinda and Gregory RAMIREZ, husband and wife, natural parents of Heather Lynn Ramirez, deceased, and Gregory Ramirez, Jr., brother of Heather Lynn Ramirez, deceased, Plaintiffs/Appellants,**

v.

**HEALTH PARTNERS OF SOUTHERN ARIZONA, Defendant/Appellee.**

No. 2 CA–CV 97–0083.

Court of Appeals of Arizona,
Division 2, Department B.

June 23, 1998.

Review Denied March 19, 1999.

Reconsideration Denied March 19, 1999.

Stompoly, Stroud, Glicksman & Erickson, P.C., By George H. Erickson, Tucson, Attorneys for Plaintiffs/Appellants.

Law Offices of Barry A. MacBan, By Laura V. MacBan, Tucson, Attorneys for Defendant/Appellee.

Lewis and Roca, LLP, By Susan M. Freeman, Steven J. Labensky, and Karen C. Owens, Phoenix, Attorneys for Amicus Curiae, Arizona Hospital & Healthcare Association and Donor Network of Arizona.

## OPINION

PELANDER, Presiding Judge.

¶ 1 This case presents issues of first impression concerning the scope and constitutionality of statutory qualified immunity provided under Arizona's version of the Uniform Anatomical Gift Act (the Act), A.R.S. §§ 36–841 through 36–849.[1] Plaintiffs/appellants, surviving parents and brother of decedent Heather Lynn Ramirez, appeal from the trial court's summary judgment in favor of defendant/appellee Health Partners of Southern Arizona (HPSA) on their claims arising out of the unauthorized harvesting of bone from the decedent. We affirm.

## BACKGROUND

¶ 2 Although the facts in this case are essentially undisputed, we view the evidence and reasonable inferences therefrom in the light most favorable to plaintiffs.[2] *Prince v.*

---

**1.** The Act was amended and renumbered effective May 1, 1996, and is now called the Revised Arizona Anatomical Gift Act, A.R.S. §§ 36–841 through 36–850. We refer in this decision to the statutes as they existed in March 1995, when the events at issue occurred.

**2.** Plaintiffs' briefs contain no citations to the record, as required by Rule 13(a)(4), Ariz.R.Civ.App. P., 17B A.R.S. "We caution counsel that this court may disregard their statements of facts if they fail to comply with Rule 13." *Lansford v. Harris*, 174 Ariz. 413, 417 n. 1, 850 P.2d 126, 130 n. 1 (App.1992). *See also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are

*City of Apache Junction,* 185 Ariz. 43, 912 P.2d 47 (App.1996). On March 22, 1995, decedent Heather Ramirez was ejected from a car during a single vehicle accident and taken to Tucson Medical Center (TMC), where she died of head injuries later that day. Shortly after her death, Barry Spencer, a social worker employed by HPSA and TMC, approached plaintiffs at the hospital, counseled the family, and discussed with them the possibility of organ and tissue donation. The family consented to donate certain tissues, and Spencer filled out a TMC form entitled "Consent for Anatomical Gift & Organ/Tissue Recovery" (the consent form). On that form, decedent's father indicated his consent to donating her eyes, skin graft, connective tissue, saphenous veins, and heart valves. Because one of the parents was not comfortable with the concept of bone donation, Spencer scratched out the form's designation for "Bone." Spencer also wrote on the form that the family wished "nothing disfiguring, family will want a viewing with a short sleeve low cut top." Both Spencer and Mr. Ramirez signed and dated the form.

¶ 3 Spencer then called the American Red Cross (ARC) regional services office in California and spoke to Anthony Schiavoni, a Donor Development Coordinator, who filled out and made notes on a "Donor Referral Information Sheet" (the ARC form) during their conversation. Neither Spencer nor Schiavoni recall the specifics of that telephone conversation. Spencer's regular practice was to read the information directly from the consent form. Based upon the substance of the telephone conversation, however, Schiavoni understood from Spencer that Mr. Ramirez had consented to the donation of decedent's bone as well as other tissues and organs. Therefore, Schiavoni wrote and checked "bone" on the ARC form.

¶ 4 After his phone conversation with Schiavoni, Spencer placed a copy of the consent form in the decedent's medical chart at TMC. From that point on, neither Spencer nor HPSA was involved in the tissue donation or procurement process. Schiavoni contacted Ben Headen, the Tissue Procurement Coordinator for the ARC Southern Arizona Tissue Services office in Tucson, and sent by facsimile the ARC form and several other documents to him. Headen then arranged to go to TMC to procure the donated tissues. He personally reviewed the decedent's TMC chart, which included the donation consent form, before harvesting any tissues. He took special note of the "nothing disfiguring" notation in the chart, but overlooked the lack of consent for bone removal. Headen and his team then harvested the heart, femur bones, and other tissues from the decedent on the evening of March 22.[3]

¶ 5 When plaintiffs later discovered that bones had been harvested contrary to their specific request and the explicit notations on the consent form, they sued HPSA and ARC, claiming that the wrongful harvesting constituted battery, gross medical negligence, breach of contract, and intentional and/or negligent infliction of emotional distress.[4] HPSA moved for summary judgment, contending plaintiffs had failed to establish that HPSA had acted in bad faith, a requirement for liability under the Act. The trial court granted the motion, finding that plaintiffs had failed to produce "evidence to negate the [Act's] rebuttable presumption of good faith." This appeal followed.

## DISCUSSION

¶ 6 On appeal from a summary judgment, we review *de novo* whether there are any genuine issues of material fact and whether the trial court erred in applying the law. *Prince.* Issues involving statutory interpre-

---

not like pigs, hunting for truffles buried in [the record].").

**3.** According to ARC's disclosure statement which its authorized representative verified, Headen admitted "that he had obviously misread the original Consent at the hospital when he reviewed Heather's chart there prior to undertaking tissue procurement," and ARC acknowledged that "bone tissue had been erroneously procured be-

cause the Consent had been misread and misinterpreted" by its representatives.

**4.** Plaintiffs have settled with ARC, which was not a party to this appeal. In addition, plaintiffs voluntarily dismissed their medical negligence claim before HPSA moved for summary judgment.

tation and constitutional claims are questions of law subject to this court's *de novo* review. *Id.*; *Little v. All Phoenix S. Community Mental Health Ctr.*, 186 Ariz. 97, 919 P.2d 1368 (App.1995).

¶ 7 Arizona has had statutes authorizing donations of body parts since 1954.[5] In 1968, the National Conference of Commissioners on Uniform State Laws adopted the Uniform Anatomical Gift Act (UAGA). *See* Unif. Anatomical Gift Act (1968), 8A U.L.A. 94 (1993). The 1968 UAGA contained a good faith immunity provision, which the Arizona legislature adopted and enacted as § 36–847(C) in 1970. *See id.* § 7(c), 8A U.L.A. 124; A.R.S. § 36–847(C) (1970). That section (now § 36–850(C)), which remained unchanged in Arizona until 1996, provides in part: "A person who acts in good faith in accord with the terms of this article ... is not liable for damages in any civil action ... for his act."

¶ 8 In 1987, the National Conference approved a revised UAGA, which superseded the 1968 UAGA. *See* Unif. Anatomical Gift Act (1987) and historical notes, 8A U.L.A. 19, 29. The 1987 UAGA amended the good faith immunity section by providing in part: "A hospital, physician, ... technician, or other person, who acts in accordance with this [Act] ... or attempts in good faith to do so is not liable for that act in a civil action or criminal proceeding." *Id.* § 11(c), 8A U.L.A. 59–60.[6] That same year, the legislature expanded Arizona's immunity provision by adding § 36–849(F), including a presumption of good faith, which the UAGA does not contain. 1987 Ariz. Sess. Laws, ch. 131. That section (now § 36–845(E)) provides:

No hospital, person or entity is subject to civil damages or legal action as a consequence of good faith acts or omissions related to procurement of organs or tissue in compliance with this article. All acts and omissions are presumed to be in good faith unless the acts or omissions are done with intent to maliciously cause injury.

¶ 9 At the time of decedent's death, former § 36–849(C) (now § 36–845) required Spencer (as the authorized representative of TMC and HPSA) to "attempt to obtain consent to donate ... the gift of all or any part of the decedent's body for any purpose" prescribed in the Act. Similarly, former § 36–849(B) obligated Spencer to "notify an appropriate organ or tissue procurement agency [ARC in this case] within a period of time to permit a viable donation." Thus, Spencer's actions in approaching decedent's family, obtaining their consent for donation of certain tissues and organs, and then notifying and communicating that information to ARC were statutorily mandated.[7]

¶ 10 As they did in the trial court, plaintiffs contend HPSA is not entitled to statutory immunity because Spencer did not comply with the Act, and questions of fact as to his good faith preclude summary judgment. Alternatively, plaintiffs argue that the Act's immunity provisions violate article 18, § 6 (anti-abrogation clause) and article 2, § 13 (equal protection) of Arizona's constitution. Because we decide cases on nonconstitutional grounds if possible, *Little*, we address plaintiffs' contentions in the order they present them.

## I. Statutory Qualified Immunity

¶ 11 "The primary rule of statutory construction is to find and give effect to legislative intent." *Mail Boxes, Etc. v. Indus. Comm'n*, 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995). We focus first on the statutory wording and, if it is ambiguous or inconclusive, we consider the statute's "context,

---

**5.** *See* 1954 Ariz.Sess.Laws, ch. 6, enacting Ariz. Code of 1939 §§ 43–5202a through 43–5202e (Bobbs–Merrill Supp.1954). The 1954 Act provided that "no person, association or corporation shall be subject to liability for any act performed in carrying out such instructions of the donor or testator." § 43–5202e.

**6.** Arizona adopted that language in current § 36–850(C), effective May 1, 1996. 1996 Ariz.Sess. Laws, ch. 333, § 4.

**7.** We note that organ donation is a matter of both state and federal law. In 1986, Congress directed that in order to remain eligible for any federal Medicare or Medicaid funds, hospitals must establish written protocols to ensure that the families of potential donors are informed of their option to donate their deceased kin's organs and to carry out any donation. Budget Reconciliation Act of 1986 § 9318(a), Pub.L. No. 99–509, 100 Stat. 1874, 2009 (codified as amended 42 U.S.C.A. § 1320b–8 (West 1991 & Supp.1998)).

subject matter, historical background, effects, consequences, spirit, and purpose." *Id.* at 122, 888 P.2d at 780. In addition, statutes limiting common law liability must be strictly construed. *Stramka v. Salt River Recreation, Inc.,* 179 Ariz. 283, 877 P.2d 1339 (App.1994); *cf. Fidelity Sec. Life Ins. Co. v. State,* 191 Ariz. 222, 954 P.2d 580 (1998).

¶ 12 Plaintiffs contend HPSA is not entitled to qualified statutory immunity because Spencer "failed to abide by the terms of the Act when he instructed the Red Cross to remove tissues which he admits he knew were not gifted." They assert that qualified immunity under §§ 36–849(F) and 36–847(C) is conditioned on the person acting "in compliance with [the Act]" and "in accord with [its] terms" respectively. According to plaintiffs, that qualifying language in the statutes means that any failure to strictly comply with the Act's terms, in this case Spencer's allegedly miscommunicating to ARC that decedent's bone had been donated, deprives the defendant of immunity and renders the issue of good faith irrelevant. We disagree. In our view, §§ 36–847(C) and 36–849(F) are intended to immunize good faith efforts to comply with the Act's mandatory procedures for obtaining and conveying donative consent.

¶ 13 Most claims alleging unauthorized harvesting of body parts for which no valid consent had been given necessarily will arise from acts or omissions that deviate from the Act's terms in some respect. To accept plaintiffs' contention that statutory immunity is automatically unavailable in such cases would completely dilute, if not altogether eliminate, the good faith defense. Such a result appears contrary to the clear legislative intent and, therefore, we reject it.[8] *See Perry v. St. Francis Hosp. & Medical Center,* 886 F.Supp. 1551, 1557 (D.Kan.1995) (good faith immunity provision, including the

phrase "in accord with the terms of this act," extends protection "in all instances but where the challenged actions violate or exceed the terms of UAGA *and* are taken without a good faith effort to comply with UAGA") (emphasis added). Accordingly, that Spencer allegedly miscommunicated the family's wishes to ARC by inadvertently including bone as a donated item does not automatically preclude the good faith immunity defense under §§ 36–847(C) and 36–849(F).

¶ 14 We also reject plaintiffs' contention that a question of fact exists as to whether HPSA acted in good faith. Spencer was not involved in any way in the actual harvesting of the "ungifted" tissue and clearly acted within the scope of his mandatory duties under § 36–849. Based on his routine practice of reading directly from the consent form as he spoke with ARC's representative, Spencer believes he correctly relayed the information from the form to ARC in this case. Even assuming *arguendo* Spencer inadvertently miscommunicated the family's wishes concerning bone donation, however, that alone is insufficient to overcome the statutory presumption of good faith under § 36–849(F) or to rebut HPSA's uncontroverted evidence that Spencer acted in good faith at all times in his dealings with plaintiffs and ARC in this case.

¶ 15 Although good faith generally is a question of fact, several courts have upheld and applied the UAGA's good faith immunity defense, as a matter of law, against claims similar to those presented in this case. *See, e.g., Lyon v. United States,* 843 F.Supp. 531 (D.Minn.1994); *Kelly–Nevils v. Detroit Receiving Hosp.,* 207 Mich.App. 410, 526 N.W.2d 15 (1994); *Nicoletta v. Rochester Eye & Human Parts Bank,* 136 Misc.2d 1065, 519 N.Y.S.2d 928 (Sup.Ct.1987); *Brown v. Delaware Valley Transplant Program,* 420 Pa.Super. 84, 615 A.2d 1379 (1992); *cf. Sea-*

---

8. One commentator has noted that the drafters of the UAGA "manifestly intended that the disclaimer protect the donee and others utilizing an anatomical gift who lack actual knowledge of a flaw in the preparation or communication of the gift." Frederic A. Luyties, *Suggested Revisions to Clarify the Uncertain Impact of Section 7 of the Uniform Anatomical Gift Act on Determinations of Death,* 11 Ariz.L.Rev. 749, 763 (1969). The arti-

cle also quotes a letter from consultants to a special committee of the National Conference stating that the UAGA's language "person who acts in good faith *in accord with the terms of this Act*" means that "a person *who follows the procedures* outlined in the Uniform Act should not be subject to civil liability or criminal prosecution." *Id.* at 764 n. 46 (emphasis supplied).

*mans v. Harris County Hosp. Dist.*, 934 S.W.2d 393 (Tex.App.1996). Courts have consistently defined good faith for purposes of the Act as an " 'honest belief, the absence of malice and the absence of a design to defraud or to seek an unconscionable advantage.' " *Nicoletta*, 519 N.Y.S.2d at 930, *quoting Black's Law Dictionary* 623 (5th ed.1979). *See also Perry; Lyon; Kelly–Nevils*. That definition is consistent with the statutory presumption in § 36–849(F), under which "[a]ll acts and omissions are presumed to be in good faith unless the acts or omissions are done with intent to maliciously cause injury." Plaintiffs cite no facts from the record supporting a claim of lack of good faith on Spencer's part, let alone any evidence showing he intended to maliciously injure the decedent or her family.

¶ 16 The *Lyon* case is particularly instructive and supports the trial court's ruling here. In that case, the court granted summary judgment based on its conclusion that the defendant hospital had acted in good faith when it arranged to have the decedent's eyes removed, even though the decedent and his family had expressed their intent not to donate organs or tissues. A hospital doctor had asked the decedent's family to sign a standard eye donor form, believing it was necessary to authorize an autopsy. The eye bank then removed the decedent's eyes without knowing that the authorization did not reflect the family's express intent. Similarly, here HPSA obtained Mr. Ramirez's limited consent, tried to convey it to ARC, and placed it in the decedent's hospital chart for confirmation without knowing ARC erroneously believed bone tissue had been donated.

■ ¶ 17 Significantly, the court in *Lyon* held that the hospital, through its doctor, had acted in good faith because the doctor was confused by the consent form and mistakenly allowed the form to communicate to others that eyes were donated, contrary to his or the family's intent. In granting summary judgment, the court stated: "The good faith exception to civil and criminal liability is designed for situations such as the one before the court, where because of confusion, an organ is removed without genuine con-

sent." *Lyon*, 843 F.Supp. at 536. We agree with that reasoning and, contrary to plaintiffs' arguments, find it applicable here.

¶ 18 We also find the *Perry* case helpful for comparative purposes. Unlike this case, the evidence in *Perry* showed that a hospital nurse "lacked an honest belief in what she told the plaintiffs and misled them into signing the consent while knowing their opposition to the removal of [decedent's] eyes and bones." *Perry*, 886 F.Supp. at 1559. Thus, there was "evidence of more than a mere mistake, bad judgment, or understandable confusion" on the nurse's part, but rather of "a conscious or intentional wrongdoing carried out for a dishonest purpose or furtive design." *Id.* There is no similar evidence in this case.

¶ 19 Plaintiffs' reliance on *Williams v. Hofmann*, 66 Wis.2d 145, 223 N.W.2d 844 (1974), is misplaced. Unlike *Williams*, where the plaintiff's claims were based on the course of treatment decedent had received while still alive, plaintiffs' only claim in this case is that HPSA wrongfully caused injury to a dead body by miscommunicating limitations on the extent of donated tissue. Inadvertently causing removal of tissue without genuine consent because of confusion or miscommunication, however, does not automatically establish a lack of good faith. *Lyon*. In the absence of any evidence refuting HPSA's showing of Spencer's good faith or rebutting the statutory presumption in § 36–849(F), HPSA was entitled to summary judgment unless the statutory basis therefor is unconstitutional. Accordingly, we turn to that issue.[9]

## II. Constitutional Claims

■ ¶ 20 Statutes are presumed to be constitutional, and the party asserting that a statute is unconstitutional has the burden of clearly demonstrating that it is. *Hall v. A.N.R. Freight System, Inc.*, 149 Ariz. 130, 717 P.2d 434 (1986); *Chevron Chem. Co. v. Superior Court*, 131 Ariz. 431, 641 P.2d 1275 (1982). If possible, we construe a statute so as to avoid rendering it unconstitutional, resolving any doubts in favor of its constitu-

9. The trial court did not address or rule on    plaintiffs' constitutional claims.

tionality. *Hayes v. Continental Ins. Co.*, 178 Ariz. 264, 872 P.2d 668 (1994); *Chevron.* Similarly, "we will not interpret a law to deny, preempt, or abrogate common-law damage actions unless the statute's text or history shows an explicit legislative intent to reach so severe a result." *Hayes,* 178 Ariz. at 273, 872 P.2d at 677.

¶ 21 Plaintiffs first contend the Act's qualified immunity provisions abrogate their fundamental right to sue for negligence in the organ donation process, in violation of article 18, § 6 of the Arizona Constitution. That section provides:

> The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

Our supreme court has stated that that section "is broad, unambiguous, and protects 'the right of action to recover damages for injuries.' " *Hazine v. Montgomery Elevator Co.,* 176 Ariz. 340, 343, 861 P.2d 625, 628 (1993), *quoting* Ariz. Const. art. 18, § 6. The court also has held that the constitutional protection " 'is not limited to those elements and concepts of particular [causes of action] which were defined in our pre-statehood case law,' " but rather encompasses "[t]he evolution of common law causes of action." *Id.* at 344, 861 P.2d at 629, *quoting Boswell v. Phoenix Newspapers,* 152 Ariz. 9, 18, 730 P.2d 186, 195 (1986). Thus, it has been said that article 18, § 6 essentially "constitutionalized the law of torts." *Hazine,* 176 Ariz. at 345, 861 P.2d at 630 (Feldman, C.J., specially concurring). *See also Alabam's Freight Co. v. Hunt,* 29 Ariz. 419, 443, 242 P. 658, 665 (1926) (through article 18, § 6, "common-law action of negligence ... was taken from its status as one subject to the will of the legislature and imbedded in the Constitution").

¶ 22 Although our supreme court has interpreted article 18, § 6 to protect the right to bring any common law causes of action, the court also has noted that it "prohibits legislative abrogation, but not legislative regulation, of a right of action." *Boswell,* 152 Ariz. at 18, 730 P.2d at 195. "[T]he legislature has 'a constitutional role [in tort law] and may regulate, so long as it does not abrogate.' " *Jimenez v. Sears, Roebuck &*

*Co.,* 183 Ariz. 399, 408, 904 P.2d 861, 870 (1995), *quoting Hazine,* 176 Ariz. at 346, 861 P.2d at 631 (Feldman, C.J., specially concurring). As the court has stated:

> The legislature may regulate the cause of action for negligence so long as it leaves a claimant reasonable alternatives or choices which will enable him or her to bring the action. It may not, under the guise of "regulation," so affect the fundamental right to sue for damages as to effectively deprive the claimant of the ability to bring the action. The intent of our unique constitutional provisions was to enact a "different and more advanced" policy ... "which made it possible to enforce in court a claim for personal injury or death without the necessity of overcoming practically insurmountable defenses."

*Barrio v. San Manuel Div. Hosp.,* 143 Ariz. 101, 106, 692 P.2d 280, 285 (1984) (citation omitted), *quoting Indus. Comm'n v. Crisman,* 22 Ariz. 579, 595, 199 P. 390, 395 (1921) (McAlister, J., concurring).

¶ 23 In evaluating a statute's effect on common law causes of action, attempting to divine the difference between legislative regulation and abrogation is difficult at best. *Compare Little and Young through Young v. DFW Corp.,* 184 Ariz. 187, 908 P.2d 1 (App. 1995), *with Jimenez and Humana Hosp. Desert Valley v. Superior Court,* 154 Ariz. 396, 742 P.2d 1382 (App.1987). We need not wade into that quagmire, however, unless there is a recognized "right of action to recover damages for injuries" caused by HPSA's alleged negligence. Ariz. Const. art. 18, § 6. If no such right exists, the anti-abrogation clause is not implicated. *See Evenstad v. State,* 178 Ariz. 578, 586, 875 P.2d 811, 819 (App.1993) (no abrogation where "neither the Arizona courts nor the legislature has ever recognized a right of action" in the area shielded by immunity); *cf. Ashton–Blair v. Merrill,* 187 Ariz. 315, 318, 928 P.2d 1244, 1247 (App.1996) (no abrogation where common law immunities apply and where "the Arizona Constitution never guaranteed a cause of action for any perceived harm" arising from privileged situations).

¶ 24 In order to analyze plaintiffs' abrogation argument, we must first deter-

mine the nature and basis of their cause of action and then evaluate the Act's effect on it. Relying on Restatement (Second) of Torts § 868 (1979), plaintiffs currently fashion their claim as one for wrongful interference with a dead body.[10] This court first recognized a general common law claim under that section in *Tomasits v. Cochise Memory Gardens, Inc.,* 150 Ariz. 39, 721 P.2d 1166 (App.1986), which involved a claim for wrongful disinterment and reburial of the bodies of the plaintiff's parents, without notice to her. *See also Morton v. Maricopa County,* 177 Ariz. 147, 865 P.2d 808 (App. 1993) (county medical examiner's office liable for negligently preventing proper interment or cremation of skeletal remains). In *Tomasits,* we looked to Restatement § 868, which provides:

> One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body.

¶ 25 For several reasons, we are not inclined to apply § 868 to actions such as this arising in the organ donation context. First, both *Tomasits and Morton* involved facts and claims totally dissimilar to those presented here. That we followed § 868 for claims of wrongful disinterment, burial, and disposal of a decedent's remains does not necessarily mean we should do so in this case. Moreover, the Act clearly is not directed at and does not otherwise affect the type of general negligence claims at issue in those cases.

¶ 26 Second, although Arizona courts usually follow the Restatement of the Law "if there is no statute or case law on a particular subject," *Martinez v. Woodmar IV Condominiums Homeowners Ass'n,* 189 Ariz. 206, 208, 941 P.2d 218, 220 (1997), we will not do so blindly. *Small v. Ellis,* 90 Ariz. 194, 367 P.2d 234 (1961). Rather, we must consider whether the Restatement position, as applied to a particular claim, is logical, furthers the interests of justice, is consistent with Arizona law and policy, and has been generally acknowledged elsewhere. *See Ft. Lowell–NSS Limited Partnership v. Kelly,* 166 Ariz. 96, 800 P.2d 962 (1990); *Cannon v. Dunn,* 145 Ariz. 115, 116, 700 P.2d 502, 503 (App.1985) ("One of the reasons, if not the main reason that we follow the Restatement in the absence of prior Arizona decisions, is that the Restatement is supposed to represent the general law on the subject in the United States."). Our supreme court has cautioned against mindlessly following the Restatement in lock step fashion "when to do so would result in the recognition of a new cause of action in this jurisdiction." *Reed v. Real Detective Pub. Co.,* 63 Ariz. 294, 303, 162 P.2d 133, 138 (1945). More importantly, we do not write on a blank slate in this case, inasmuch as the Arizona legislature already has seen fit to immunize those persons who participate in the organ procurement process from liability for good faith acts or omissions.[11]

¶ 27 Third, § 868 of the current Restatement appears to represent a minority view. The prior edition of the Restatement conditioned liability for wrongful interference with

---

**10.** Plaintiffs' complaint alleged various tort and contract theories. In opposing HPSA's motion for summary judgment, plaintiffs did not mention any of those claims, but rather contended for the first time that "[l]iability is clear under *Restatement 2d of Torts,* § 868, and *Tomasits v. Cochise Memory Gardens, Inc.,* 150 Ariz. 39, 721 P.2d 1166 (App.1986)." Although we have substantial doubt about the legal validity of the liability theories formally alleged in plaintiffs' complaint and any evidentiary support for them, the parties neither briefed nor argued, and the trial court did not address, those issues.

**11.** As noted above, Arizona has had statutes authorizing donations of body parts since 1954, all of which provided some form of immunity for claims based on violation of the statute. *See*

1954 Ariz.Sess. Laws, ch. 6, enacting Arizona Code of 1939 §§ 43–5202a through 43–5202e, 43–5202e (immunity); 1970 Ariz.Sess.Laws, ch. 147, enacting A.R.S. §§ 36–841 through 36–848, 36–847(C) (immunity) (adopting 1968 UAGA); 1986 Ariz.Sess. Laws, ch. 261, enacting A.R.S. §§ 11–594, 11–594.01, amending A.R.S. § 36–847 and adding § 36–849 (with immunity provision); 1987 Ariz.Sess. Laws, ch. 131, amending A.R.S. §§ 36–847, 36–849 (immunity provision); 1996 Ariz.Sess. Laws, ch. 333, amending A.R.S. § 11–594, repealing the prior Anatomical Gift Act and enacting §§ 36–841 through 36–850, 36–845(E) (immunity), 36–850(C) (immunity) (adopting 1987 UAGA with variation, after the events in this case).

a dead body on wanton or intentional misconduct, providing: "A person who wantonly mistreats the body of a dead person or who without privilege intentionally removes, withholds or operates upon the dead body is liable to the member of the family of such person who is entitled to the disposition of the body." Restatement of Torts § 868 (1939). In *Hale v. Brown,* 84 Ariz. 61, 323 P.2d 955 (1958), our supreme court alluded to that rule in affirming a summary judgment for defendants based on insufficient evidence to support plaintiff's claim for wrongful embalming.

¶ 28 The current version of § 868, which expanded liability by including negligence, was officially adopted by the American Law Institute in 1977.[12] Although this court in *Tomasits* and *Morton* has followed that section under much different factual scenarios not involving organ donation, the majority rule continues to require "intentional or malicious, as opposed to negligent, interference" with a dead body for liability to attach. *Burgess v. Perdue,* 239 Kan. 473, 721 P.2d 239, 245 (1986). *See also Gonzalez v. Metropolitan Dade County Public Health Trust,* 651 So.2d 673 (Fla.1995); *Chisum v. Behrens,* 283 N.W.2d 235 (S.D.1979); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 54, at 362 (5th ed.1984) (recognizing the "traditional rule [that had] denied recovery for mere negligence [in the mishandling of dead bodies], without circumstances of aggravation").[13] Prosser and Keeton describe their view of the true nature of claims relating to dead bodies as follows:

Finally, there are a great many cases involving the mishandling of dead bodies, whether by mutilation, disinterment, interference with proper burial, or other forms of intentional disturbance. In most of these cases the courts have talked of a somewhat dubious "property right" to the body, usually in the next of kin, which did not exist while the decedent was living, cannot be conveyed, can be used only for the one purpose of burial, and not only has no pecuniary value but is a source of liability for funeral expenses. It seems reasonably obvious that such "property" is something evolved out of thin air to meet the occasion, and that in reality the personal feelings of the survivors are being protected, under a fiction likely to deceive no one but a lawyer.

Some cases have avoided all of these difficulties by recognizing what is sufficiently obvious, that the tort is in reality merely the intentional infliction of mental distress.

Keeton, § 12, at 63. Plaintiffs' claims clearly would fail under the traditional, majority rule, because there is no evidence in this record of any wanton, reckless, or intentional misconduct on HPSA's part.

¶ 29 Fourth, there are sound policy reasons for requiring more than negligence to impose liability on those persons who participate in good faith in the organ procurement process. There is a critical state interest in encouraging organ donation and protecting procurement personnel who engage in that important work. When the Arizona legislature considered the 1996 revisions to the Act, the following information was brought to its attention:

According to Donor Network of Arizona, there are over 43,000 Americans currently on a waiting list for donated organs. Over 60% of all organ transplant recipients are between the ages of 18 and 49. Anatomical donations may include hearts and heart valves, livers, kidneys, lungs, bones, cartilage, tendons, ligaments, corneas, veins and more. Records for Arizona show that in 1995 there were 78 organ donors. From the anatomical gifts of these donors, 144 Arizona patients and 126 patients outside of Arizona received life-saving transplants.

---

12. *See Restatement* (Second) of Torts § 868 cmt. a (liability may lie against one who "negligently mistreats or improperly deals" with the body); § 868 cmt. d (§ 868 applies to "merely negligent" interference with body).

13. In somewhat analogous cases involving wrongful autopsy claims, courts have applied qualified immunity provisions or otherwise shielded defendants from liability in the absence of bad faith or malice. *See, e.g., Stath v. Williams,* 174 Ind.App. 369, 367 N.E.2d 1120 (1977); *Gahn v. Leary,* 318 Mass. 425, 61 N.E.2d 844 (1945); *Grad v. Kaasa,* 312 N.C. 310, 321 S.E.2d 888 (1984); *Frick v. McClelland,* 384 Pa. 597, 122 A.2d 43 (1956).

At the end of 1995, a total of 417 persons continued to await transplants. Nationally, approximately nine persons die daily while awaiting organ transplants. In Arizona, five persons die each month, or 60 persons each year, while on a transplant list.[14]

¶ 30    As the amicus curiae Arizona Hospital & Healthcare Association and Donor Network of Arizona correctly point out, Arizona's Act, "like its uniform law counterparts in every state, is intended to enable timely gifts to be made and effectuated, while balancing such factors as the wishes of the decedent and family, the need for autopsies in cases of crime and liability disputes, and when protection from liability should be afforded to persons involved in efforts to carry out anatomical gifts." *See* Unif. Anatomical Gift Act, prefatory note, 8A U.L.A. 20. Similarly, the court in *Lyon* stated:

> The Uniform Anatomical Gift Act is clearly designed to balance two competing policy interests. There is. the need for donations of eyes and other organs for transplantation and research purposes. Time is usually of the essence in securing donated organs at the time of the donor's death. The Act allows hospitals and physicians to ascertain with a high degree of certainty when someone is willing to donate organs, and to arrange for the prompt removal and preservation of donated organs. The Act also recognizes the religious and moral sensibilities of those who do not wish to donate organs. The Act does not compel organ donations nor does it establish a presumption that organs will be donated.

*Lyon,* 843 F.Supp. at 536. Organ donation, often referred to as the "gift of life," is a relatively recent medical phenomenon that has tremendous benefits for mankind. Even if qualified immunity were not provided by statute, the foregoing policy considerations militate in favor of such protection and influence our crafting of common law liability rules in this area. *See Estate of Hernandez v. Arizona Bd. of Regents,* 177 Ariz. 244, 866 P.2d 1330 (1994) (recognizing public policy, societal and technological changes as factors

in evolution of tort law); *Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200 (1983).

¶ 31    The Act is not "a statute that requires victims to sue before they are injured," *Bryant v. Continental Conveyor & Equip. Co.,* 156 Ariz. 193, 198, 751 P.2d 509, 514 (1988) (Feldman, J., dissenting), *overruled in Hazine;* a statute abolishing or barring a cause of action before it reasonably could be brought, *Barrio; Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961 (1984); or a statute purportedly limiting damages in a well-established cause of action (*e.g.,* defamation actions where retractions had been printed). *Boswell.* Nor is the Act a subsequently-enacted statute that is specifically intended to and does directly impinge on an established general negligence cause of action that Arizona courts previously had expressly recognized, thereby totally depriving a foreseeable class of plaintiffs of that established tort claim. *See, e.g., Little* (holding § 36–517.02 unconstitutionally abrogates the common law cause of action established in *Hamman v. County of Maricopa,* 161 Ariz. 58, 775 P.2d 1122 (1989)); *Young* (holding § 4–312(B) unconstitutionally abrogates general negligence cause of action recognized in *Ontiveros* ). As noted above, the statutes challenged here do not completely abolish the common law cause of action for interference with dead bodies, as recognized in *Tomasits;* and as the *Perry* case illustrates, claimants who have been injured by bad faith actions of persons involved in the organ donation process may sue and recover against them.

■   ¶ 32    In sum, Arizona courts have not recognized a common law action for negligence in the organ donation context and, without retreating from our holdings in *Tomasits* and *Morton,* we see no good reason for doing so now. The parties have cited no cases, nor have we found any, in which such a claim has been upheld. The Act's qualified immunity provisions are consistent with the majority (if not unanimous) rule of other jurisdictions, the UAGA, and public policy. Accordingly, because the Act does not abrogate any viable "right of action to recover

---

**14.** Arizona State Senate, Revised Fact Sheet for    H.B. 2315 (March 1996).

damages," it does not violate article 18, § 6.[15] *See Evenstad; Ashton–Blair; cf. Williams,* 223 N.W.2d at 847, 847 n. 4 (rejecting plaintiff's claim that the Act's good faith immunity provision "is unconstitutional because it abrogates rights of injured persons in violation of art. I, sec. 9 of the Wisconsin Constitution," which entitles every person "to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person. . . .").

¶ 33 Plaintiffs finally contend the Act's qualified immunity provisions violate Arizona's equal protection clause, Ariz. Const. art. 2, § 13, which provides: "No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." According to the plaintiffs, the immunity provisions impinge on their fundamental right to bring a common law claim for negligence. *See Kenyon,* 142 Ariz. at 83, 688 P.2d at 975 (holding "the right to bring and pursue [an] action is a 'fundamental right' guaranteed by Article 18, § 6 of the constitution and the [equal protection clause]"); *Lerma v. Keck,* 186 Ariz. 228, 232, 921 P.2d 28, 32 (App.1996) ("Under the Arizona Constitution, claimants have a fundamental right to bring and pursue an action for damages."). Thus, plaintiffs argue, the Act must be subjected to a strict scrutiny test, and its immunity provisions may be upheld only if they are necessary to accomplish a compelling governmental interest and further that interest by the least restrictive means practically available. *Kenyon,* 142 Ariz. at 86–87, 688 P.2d at 978–79.

¶ 34 Having concluded that the Act does not unconstitutionally abrogate any fundamental right to bring a lawsuit for negligence in the organ donation context, we likewise conclude that it does not interfere with a fundamental right so as to require application of the strict scrutiny test. Because we are not dealing here with a fundamental right or suspect class, the rational basis test applies to plaintiffs' challenge. *Evenstad; Pike v. Arizona Dep't of Transp.,* 261 Ariz. Adv.Rep. 29, 1998 WL 30531 (Ct.App. January 29 (1998). Under that test, we will uphold legislation if it serves a legitimate state interest and the legislative classification rationally furthers that interest. *Kenyon; Lerma.* "We must presume that the legislation is rational, and such presumption can be overcome only by 'a clear showing of arbitrariness or irrationality.'" *Lerma,* 186 Ariz. at 233, 921 P.2d at 33, *quoting Church v. Rawson Drug & Sundry Co.,* 173 Ariz. 342, 350, 842 P.2d 1355, 1362 (App.1992). Moreover, "we may consider either the legislature's *actual* purpose or any *hypothetical* basis upon which it could have acted." *Lerma,* 186 Ariz. at 233, 921 P.2d at 33.

¶ 35 In view of the significant policy considerations discussed above, we have no doubt that the Act passes muster under the rational basis test. The Act, including its immunity provisions, serves the legitimate state interest of providing people with a timely opportunity to donate organs. Grant-

---

15. Although we express no opinion on their constitutionality, we note that a number of other Arizona statutes provide similar protections to those who act in good faith or without malice or gross negligence in a variety of situations. *See, e.g.,* A.R.S. §§ 12–571 (health professional who, without compensation, provides treatment at nonprofit clinic not liable in medical malpractice action unless grossly negligent); 13–3620(F) (person reporting suspected nonaccidental injury to child as required by section immune from liability in absence of malice); 14–5651(E), (F) (person who in good faith provides information on private fiduciary's misconduct is not subject to civil liability; private fiduciary advisory board and staff immune from civil liability for good faith conduct); 23–1361(C), (D) (employer who in good faith provides information requested by prospective employer about reason for employee termination is immune from civil liability; good faith presumed unless former employer acted with actual malice or intent to mislead); 32–1471 (person who renders aid at site of emergency not subject to liability for good faith acts or omissions, unless grossly negligent); 36–666(B), (D) (person disclosing communicable disease information required by article immune if acting in good faith, without malice; good faith presumed in absence of clear and convincing evidence to contrary); 36–916(A) (not liable for good faith donation of "apparently wholesome food item" or nonfood grocery product to charitable or nonprofit organization, or any other person, absent intentional misconduct or gross negligence); 41–621(J) (state officer, agent or employee not personally liable for injury resulting from act or omission in official capacity if exercise of discretion done in good faith).

ing qualified protection to hospital personnel who attempt in good faith to procure donated organs furthers that interest. We agree with the Wisconsin court that "the limitation on liability contained in [the Act] is justified by the legitimate public purpose of encouraging [health care providers] to participate in the removal of organs following death, and therefore increasing their supply." *Williams,* 223 N.W.2d at 848–49 (upholding Act's good faith immunity provision against equal protection challenge).

¶ 36 Arizona's legislature could reasonably conclude that qualified immunity for people who strive in good faith to carry out the requirements of the donation protocols is sound public policy. Donations must be obtained and processed quickly after death while tissue is still viable, in the midst of highly emotional and stressful situations. The legislature also could rationally conclude that the organ donation system will not function well unless donation personnel are assured they will not be sued for good faith mistakes in the process.

¶ 37 In *Scappatura v. Baptist Hospital,* 120 Ariz. 204, 584 P.2d 1195 (App.1978), this court recognized the policy supporting qualified immunity in the context of doctors participating in peer review. At issue was A.R.S. § 36–445.02, a provision similar to § 36–849, that granted immunity to hospital personnel for their good faith acts in the hospital peer review process. Although the constitutionality of the statute was not at issue in that case, this court noted that § 36–445.02 furthered an important public policy by encouraging hospital peer review for the benefit of hospital patients and employees. We reach a similar conclusion here with respect to organ donation.

## CONCLUSION

¶ 38 We hold that there is no common law right of action to recover damages for no more than negligent interference with a dead body in the organ donation context. Accordingly, the Act's immunity provisions do not offend article 18, § 6. In view of the legitimate and compelling state interests under the statute, we also conclude that the Act does not violate equal protection principles.

Finally, the alleged acts 'and omissions of HPSA fall within the Act's scope. In the absence of any showing of bad faith on HPSA's part, the trial court properly granted it summary judgment. We therefore affirm.

ESPINOSA and HOWARD, JJ., concur.